USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-1581 MARK MOREHEAD, Plaintiff, Appellant, v. ATKINSON-KIEWIT, J/V, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Bailey Aldrich,* Senior Circuit Judge] ____________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ Selya, Cyr, Boudin, Stahl and Lynch, Circuit Judges. ______________ ____________________ Thomas M. Bond, David B. Kaplan and The Kaplan/Bond Group on _______________ ________________ ______________________ brief for appellant. Thomas E. Clinton, Robert E. Collins and Clinton & Muzyka, P.C. __________________ _________________ _______________________ on brief for appellees. Myles W. McDonough and Sloane and Walsh on brief for J.M Cashman, __________________ ________________ Inc. and Cashman, KPA, A Joint Venture, amicus curiae. _____________ ____________________ October 10, 1996 ____________________ OPINION EN BANC ____________________  ____________________ *Of the First Circuit, sitting by designation. CAMPBELL, Senior Circuit Judge. This appeal comes ______________________ before the en banc court following our vacating of an unpublished panel decision in this case issued on February 6, 1996, affirming the decision of the district court. On the day of the panel opinion, another panel of this court handed down a decision construing the federal statute underlying both appeals in a materially different way. Rocco P. _________ DiGiovanni, Jr. v. Traylor Bros, Inc., No. 94-1775. We ________________ ____________________ vacated both opinions and granted rehearing en banc so as to provide a consistent rule in this circuit pending, at least, further instruction from the Supreme Court or Congress. Plaintiff Mark Morehead, a harbor worker injured while working on a construction barge, appeals from a judgment of the district court dismissing his negligence action against Atkinson-Kiewit, J/V ("A-K"), a firm that was both his employer and the charterer of the barge. Morehead brought this action under section 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. 901 et seq., __ ____ authorizing covered employees to sue the vessel as a third party for injury caused by the negligence of the vessel. In its capacity as Morehead's employer, A-K is immune from tort actions brought by covered employees like Morehead. But as the bare boat charterer of the barge on which Morehead was injured, A-K is deemed also to be the statutory vessel owner; and it was in this capacity that A-K was sued.  -2- 2 The case raises difficult questions of first impression in this circuit as to the liability of a so-called dual capacity employer under the LHWCA. We must decide whether A- K's alleged negligence occurred in its "employer" capacity (a capacity immune from suit), or rather was in its capacity as "vessel" (a negligence action being authorized under section 905(b) against a vessel as third-party). While the Supreme Court has endorsed the bringing of section 905(b) negligence actions against a dual capacity defendant in its vessel owner capacity, the Court has yet to define, in such a case, the point at which employer responsibility ends and vessel responsibility begins. Nor has the Court decided to what extent principles laid down in negligence actions brought by longshore workers against a vessel owned by a third-party apply to claims by non-stevedoring contractor harbor workers brought against a vessel owned by their own employer.  I. Background I. Background Mark Morehead was employed by A-K, a joint venture formed between Guy Atkinson Co. and Kiewit Eastern to complete the construction of the Jamestown Bridge spanning Narragansett Bay in Rhode Island. In order to transport materials and equipment around the bay to the work sites, A-K bare boat chartered several barges. The barges involved in this case, the CHER 106 and the HUGHES 707, were flat deck -3- 3 barges floating platforms bare of structures or equipment. A-K also leased two tugs from Woods Hole Towing Co. to transport the barges where needed. The tugs themselves were crewed by Woods Hole employees.1 A-K hired carpenters from a local union to build the bridge. Their responsibilities included cutting timbers and steel and setting up concrete forms for pours. As the local union's requirements prevented the tug captain or crew from handling the lines on the barges, some carpenters also tended the lines on the barges as "scowmen." Morehead's regular duties included both carpentry and linehandling. On January 29, 1990, Morehead and another carpenter/scowman, Steven Breault, were untying the HUGHES 707 from the CHER 106. A barge was to be surveyed in connection with her going off hire. A tug stood nearby. The barges were not at this time carrying materials or equipment, but rather were set off on the north side of the Davisville  ____________________ 1. Although Woods Hole was originally named as a defendant Pier. Breault threw a heavy line to Morehead, who, in in this action, the district court granted its motion for summary judgment against Morehead, who has not appealed from attempting to catch it, stepped backwards into an open hatch that decision. Consequently, Woods Hole is no longer a party. which was flush with the deck on one of the barges. The 2. The district court did not definitively find which barge district court noted conflicting testimony as to which barge Morehead was on at the time of the accident. The court found "more likely" that Morehead was on the HUGHES 707 and Breault Morehead was on when injured,2 but concluded that in any was on the CHER 106, but wrote: "In either event, however, the court would find a single open hatch . . . insufficiently obvious. There would seem a presumption that an unmarked 18 inch opening on an otherwise solid deck is a failure of a reasonably safe proffer to one expected to walk thereon. The court would therefore find the barge, whichever one it was, unseaworthy, but under the statute (33 U.S.C. 905(b)) this is irrelevant."  -4- 4 event, the single open hatch was insufficiently obvious. Breault testified that he had opened the hatch on the HUGHES (which he named as the barge to be surveyed) a few days before the accident, because A-K was preparing for an off- hire survey before returning the barge to the owner. Breault testified that a supervisor carpenter had told him to open the hatch.  Morehead filed a complaint against A-K and Woods Hole on April 22, 1991, alleging Jones Act negligence, unseaworthiness, maintenance and cure, and negligence under section 905(b) of the LHWCA. Following the denial of A-K's motion for summary judgment, Morehead voluntarily withdrew all claims except his claim for negligence under the LHWCA. A bench trial commenced on April 11, 1994. On April 29, 1994, the district court issued its Findings and Order dismissing Morehead's complaint and A-K's cross-claim against Woods Hole. It wrote: [T]he court does not find it negligence of [appellee] viewed in its capacity as pro hac vice owner. Rather, it appears to be a temporary condition created by it solely in its capacity as charterer. . . . These two capacities are legally separate, even though they be the same individual. This passage confusingly distinguishes between an owner pro hac vice and a bare boat charterer (the statute includes both in its definition of "vessel," see 33 U.S.C. 902(21)). The ___ parties agree that the district court actually meant to -5- 5 distinguish between the appellee as vessel and as employer. We also interpret the district court's order in that fashion. Judgment was entered on May 4, 1994 in A-K's favor. This appeal followed. II. Standard of Review II. Standard of Review A district court's fact-based findings relative to negligence are reviewable only for clear error. See, e.g., ___ ____ Levene v. Pintail Enters., 943 F.2d 528, 535-36 (5th Cir. ______ ________________ 1991), cert. denied, 504 U.S. 940 (1992). However, the _____________ question of whether the district court applied the proper standard of care is one of law, subject to de novo appellate __ ____ review. See, e.g., Keller v. United States, 38 F.3d 16, 22- ___ ____ ______ _____________ 23 (1st Cir. 1994); Elberg v. Mobil Oil Corp., 967 F.2d 1146, ______ _______________ 1149 (7th Cir. 1992).  The district court did not explain the criteria it applied in deciding what duties of care to attribute to A-K in its separate capacities, respectively, as LHWCA employer and as owner (charterer) of the barge. Rather, it simply cited along with its conclusions existing precedent relative to section 905(b) liability, e.g., Scindia Steam Navigation ____ _________________________ Co. v. De los Santos, 451 U.S. 156 (1981), and Castorina v. ___ ______________ _________ Lykes Bros. S.S., 758 F.2d 1025 (5th Cir.), cert. denied, 474 ________________ ____________ U.S. 846 (1985). The circumstances and context of these and related cases, however, are too removed for their mere -6- 6 citation to reveal the analysis that the district court applied in this case. Nor does the language of the LHWCA provide clear guidance. We can only hope that the Supreme Court will eventually elucidate the standards applicable to dual status employers of harbor workers in circumstances comparable to these. Until then, we do our best to outline the legal principles that, we believe, govern the facts presented here. Under those principles and giving due deference to the district court's authority as fact finder  we affirm the judgment below. III. "Vessel" Status III. "Vessel" Status We briefly discuss first a less troublesome issue. The district court provisionally assumed, without deciding, that the barge on which Morehead was injured was a "vessel" within the LHWCA. Section 905(b) permits an LHWCA employee to sue in negligence only "[i]n the event of injury . . . caused by the negligence of a vessel." Section 902(21) of the LHWCA defines "vessel" to include a bare boat charterer among the parties that may be held liable under section 905(b). A-K does not contest its status as bare boat charterer. Nor has it asserted on appeal that the HUGHES and CHER were not themselves "vessels" under the LHWCA. See, e.g., Kathriner ___ ____ _________ v. Unisea, Inc., 975 F.2d 657, 662 (9th Cir. 1992) (to ____________ determine whether a structure is a "vessel" under the LHWCA, -7- 7 most courts have applied the general definition in 1 U.S.C.  3 of a "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"); accord DiGiovanni v. Traylor Bros., 830 F. Supp. ______ __________ ______________ 106, 108-09 (D.R.I. 1993). The LHWCA definition of "vessel" is significantly more inclusive than that used for evaluating seaman status under the Jones Act.3 For present purposes, we may assume that both barges were vessels under the LHWCA, for the negligence of which a section 905(b) claim may be brought. IV. Statutory Framework IV. Statutory Framework The LHWCA establishes a comprehensive federal worker's compensation scheme which holds employers liable, irrespective of fault, for securing the payment of the prescribed compensation to qualified maritime employees injured in the course of their employment. 33 U.S.C. 904.4  ____________________ 3. See generally Chandris, Inc. v. Latsis, 115 S. Ct. 2172, ___ _________ ______________ ______ 2192 (1995) (to qualify as a seaman under the Jones Act, "a maritime employee must have a substantial employment-related connection to a vessel in navigation"); Kathriner, 975 F.2d __ __________ _________ at 659-63 (applying tests of "vessel" under Jones Act and LHWCA). Plaintiff withdrew his maritime claims, including the claim of Jones Act negligence. 4. Section 904 provides in relevant part: "(a) Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title . . . . (b) Compensation shall be payable irrespective of fault as a cause for the injury." 33 U.S.C. 904. -8- 8 This liability of employers is termed "exclusive and in place of all other liability of such employer to the employee." Id. 905(a).  ___ Section 905(b) of the Act authorizes certain covered employees to bring an action against the vessel as a third party if their employment injury was caused by the negligence of the vessel.5 But employees may no longer sue the vessel on  ____________________ A statutorily covered employee is "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor- worker including a ship repairman, shipbuilder, and ship- breaker," except "a master or member of a crew of any vessel" and other limited categories of workers. Id. 902(3). ___ 5. Section 905(b) provides: In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be -9- 9 a strict liability theory for her "unseaworthiness,"6 Congress having eliminated the latter as a remedy for longshore and harbor workers in the 1972 Amendments to the LHWCA. The 1972 Amendments require employees to show fault of the vessel, bar a vessel's obtaining of indemnification from the employer, and have increased the worker's compensation recoverable from an employer. See Addison v. ___ _______ Bulk Food Carriers, Inc., 489 F.2d 1041, 1042 (1st Cir. __________________________ 1974). Focusing on longshore workers who, to date, have been the occupational group chiefly discussed in Supreme Court cases under the LHWCA, the Court described these changes as designed "to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." Howlett v. _______ Birkdale Shipping Co., 114 S. Ct. 2057, 2063 (1994); see also _____________________ ___ ____ Keller, 38 F.3d at 23. ______ In the 1984 Amendments to the LHWCA, Congress further narrowed the availability of negligence actions by certain categories of harbor workers against a vessel in  ____________________ exclusive of all other remedies against the vessel except remedies available under this chapter. 33 U.S.C. 905(b). 6. See 33 U.S.C. 905(b). Unseaworthiness is a maritime ___ remedy that was established "simply by showing that some condition or appurtenance on board the vessel at the time of the accident was unreasonably hazardous, even if the stevedore-employer was the sole cause of the hazard." Keller, 38 F.3d at 23 (citing Seas Shipping Co. v. Sieracki, ______ _________________ ________ 328 U.S. 85, 94 (1946)). -10- 10 circumstances where the employer was also the owner of the offending vessel. In these so-called "dual capacity" cases, Congress barred employees providing "shipbuilding, repairing, or breaking services" from suing the employer-vessel owner for negligence in any capacity. 33 U.S.C. 905(b). The ___ Amendments did not purport to prohibit LHWCA employees other than in the described categories from suing for negligence in dual capacity cases. See H.R. Rep. No. 98-570(I), 98th ___ Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 2734, 2741 _________ __ (hereafter 1984 U.S.C.C.A.N.) ("The Committee intends that this language [in 905(b)] not be construed to limit an employee's right to bring a cause of action, except in the circumstances indicated within the language."); cf. Guilles ___ _______ v. Sea-Land Serv., Inc., 12 F.3d 381, 386 (2d Cir. 1993) _______________________ (affirming relief cook's judgment against negligent employer- vessel owner and explaining that "[t]he 1984 change . . . shows that Congress knew how to preclude a class of employees from being able to sue an employer-vessel if it chose to do so"); Gay v. Barge 226, 915 F.2d 1007, 1010 (5th ___ _________ Cir. 1990) ("[T]he 905(b) bar is specific to the occupations listed: shipbuilders, ship repairers and ship breakers."). The Supreme Court had previously interpreted section 905(b) to permit covered employees to bring third-party negligence actions against their employer qua vessel owner. -11- 11 See Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, ___ _____________________________ _______ 530-32 (1983) (asserting that if Congress had intended to exempt employer-vessel owners from negligence suits, then the sentence in section 905(b) barring recovery from them where fellow longshore workers caused the injury would have been unnecessary). As Morehead's occupational category does not fall within any of those Congress expressly excepted in the 1984 Amendments, supra, Jones & Laughlin would appear under _____ ________________ current construction of the statute to allow Morehead to bring a third-party negligence action against A-K in its vessel capacity.7 To prevail, however, Morehead has to show that any negligence on A-K's part is attributable to it as vessel rather than as Morehead's insured LHWCA employer. V. Defining the Vessel's Duty of Care: The Supreme Court V. Defining the Vessel's Duty of Care: The Supreme Court Cases Cases As Jones & Laughlin allows Morehead to bring a third- ________________ party negligence action against a vessel owner even though the latter is simultaneously his statutorily-immune employer, we need to find the principles for determining whether the alleged acts of negligence the open hatch and failure to  ____________________ 7. The parties have not disputed on appeal that Morehead is a statutorily covered employee of a statutorily covered employer. As a harbor worker with carpentry and linehandling duties, Morehead meets the statutory definition of a covered employee under section 902(3) and does not fall within any of the categories of workers expressly prohibited from suing under section 905(b). -12- 12 warn are attributable to A-K qua vessel owner rather than qua employer. The Supreme Court has indicated that Congress left to the courts the task of defining the vessel's duty of care. See Howlett, 114 S. Ct. at 2063 ("Because Congress did ___ _______ not 'specify the acts or omissions of the vessel that would constitute negligence,' the contours of a vessel's duty to longshore workers are 'left to be resolved through the "application of accepted principles of tort law and the ordinary process of litigation."'") (citing Scindia, 451 U.S. _______ at 165-66).  In Scindia Steam Navigation Co. v. De los Santos, 451 _____________________________ ______________ U.S. 156 (1981), the Supreme Court considered the duty of care that a vessel owner owed to an injured longshore worker who was employed by an independent stevedoring firm. For this common triangular relationship at least vessel, stevedore, and longshore worker8 the Court held that limiting the vessel's duty of care so as to put the chief responsibility upon the independent stevedore was consistent with Congress' intent to permit third-party negligence actions against the vessel but to eliminate the vessel's no-  ____________________ 8. In Howlett, the Court suggested that this relationship _______ was the typical one in the longshoring business. See ___ Howlett, 114 S. Ct. at 2062 ("The injured longshoreman's _______ employer in most instances, an independent stevedore, see ___ Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256 _______ ___________________________________ (1979) must pay the statutory benefits regardless of fault, but is shielded from any further liability to the longshoreman.") (other citations omitted). -13- 13 fault liability (the "unseaworthiness" claim). In Howlett, a _______ case that also involved a longshore worker suing an independent vessel, the Court restated the vessel's limited residual duties: The first, which courts have come to call the "turnover duty," relates to the ______________ condition of the ship upon the commencement of stevedoring operations . . . . The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel.". . . _____________________________ The third duty, called the "duty to ________ intervene," concerns the vessel's _________ obligations with regard to cargo operations in areas under the principal control of the independent stevedore. Howlett, 114 S. Ct. at 2063 (citations omitted) (emphasis _______ added). This court recently applied these duties in Keller v. ______ United States, 38 F.3d 16 (1st Cir. 1994), a case also ______________ involving the triangular relationship of vessel, stevedoring contractor, and longshore worker. We described two duties of a vessel prior to "turnover": the "duty to warn" and the "duty of safe condition." Id. at 23-24. We further ___ described three "continuing" duties of care: First, the vessel owner might remain under such a duty were it to retain actual physical control or custody of a portion of the vessel, or participate in stevedoring operations. Scindia, 451 _______ U.S. at 167, 101 S. Ct. at 1622 . . . . Second, a duty to intervene might attach in the event the vessel owner were to -14- 14 acquire actual knowledge that "unsafe _________________ conditions" had developed in the vessel's _________ appurtenances since turnover, that the stevedore-employer will not address the unsafe condition, and that the ___ stevedore's decision not to remedy the developing hazard was "obviously improvident" in the circumstances. Id., ___ at 174-75, 101 S. Ct. at 1625-26. Third, even absent actual control, participation or knowledge, a post-"turnover" duty may arise if the vessel owner was obligated, by contract, statute or custom, to monitor stevedoring operations for the purpose of detecting and remedying unsafe conditions. Id. at 172, 101 S. Ct. at __ 1624-25. Id. at 32. ___ Keller affirmed a judgment that an independent vessel ______ owner had breached neither its turnover nor its continuing duties to a longshore worker who had fallen from a ladder on board the vessel. We ruled that the district court had not erred in relying on testimony based on industry standards, which indicated fulfillment of the turnover duty. We also found no breach of a continuing duty of the vessel, where the allegedly dangerous condition developed during cable loading operations which were under the stevedore's control.  As did the Supreme Court in Scindia, this court noted _______ the independent stevedore's greater skill and expertise relative to the vessel's, making the former better positioned than the vessel to prevent employee injury, and the traditional stevedoring warranty to perform competently. See ___ id. at 29-30; see also Howlett, 114 S. Ct. at 2065 ("The rule ___ ___ ____ _______ -15- 15 relieving vessels from this general duty [to exercise reasonable care to discover dangerous conditions that develop] rests upon 'the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations.'") (citation omitted); Scindia, 451 U.S. at 172 ("[the 1972 _______ Amendments] did not undermine the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations"). Further supporting the vessel owner's justifiable reliance on the stevedore is that the latter is "subject to detailed legislative and administrative prescriptions for affording its workers a 'safe' workplace." Keller, 38 F.3d at 24 ______ (citing 33 U.S.C. 941 and accompanying regulations, 29 C.F.R. 1918.1-1918.106, 1918.25, and Scindia, 451 U.S. _______ at 170). In Scindia and Howlett the Supreme Court, as noted, _______ _______ outlined a vessel owner's duties of care relative to a longshore worker employed by an independent stevedore.9 But the Supreme Court has not yet had occasion to analyze the  ____________________ 9. Other courts have applied Scindia duties to LHWCA- _______ covered employees other than longshore workers in the familiar tripartite context. See, e.g., Elberg, 967 F.2d at ___ ____ ______ 1149-50 (welder); Teply v. Mobil Oil Corp., 859 F.2d 375, 377 ________________________ (5th Cir. 1988) (worker at barge-accessible oil well). -16- 16 vessel's duties in a dual capacity case.10 Nor has the Court considered to what degree its Scindia analysis applies to _______ non-longshoring harbor workers, whose duties and modus operandi often differ considerably from those of longshore workers.11 The Court has said, though, that "[o]f course, [section 905(b)] does make it clear that a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' [the insured employer] capacity." Jones & Laughlin, 462 U.S. ________________ at 531 n.6.  How to distinguish between vessel owner negligence and employer negligence where the same entity is both vessel owner and employer is key here, because Morehead's statutory right to sue is solely for injury caused by the vessel negligence of a vessel as third-party. For other work  ____________________ 10. In Jones & Laughlin, the negligence of the dual capacity ________________ defendant qua vessel had been conceded. 11. Longshore workers such as those in Scindia typically _______ load and unload cargo ships that are operated full-time by a master and crew. Vessel negligence can often be distinguished from stevedore negligence by determining to what extent the dangerous condition was caused, or allowed to persist, by reason of the neglect of the vessel's crew rather than of the stevedoring employees. Harbor workers, however, may work (as here) on construction barges that are moved about by tugs and have no fully-dedicated professional crew as such. As part of their employment, the harbor workers may do whatever is needed from time to time to tend lines and service the barges, besides performing construction duties as carpenters, electricians, or the like. Thus, assessing what responsibilities fall within the purview of the vessel's ______ duty of care, as distinguished from the employer's, can be an elusive quest. -17- 17 injuries within the scope of his employment, the LHWCA expressly provides that he must accept the worker's compensation prescribed under the LHWCA as "exclusive and in place of" all other employer liability. 33 U.S.C. 905(a). A further matter complicates this case: as the defendant has two capacities, so too, it might be said, does the plaintiff. Morehead was a carpenter, but was hired to perform both carpentry and scowmen's duties. A-K did not employ a separate crew on its barges.12 As we will discuss further below, this "double dual capacity" aspect of the case ______ is a factor to be considered in determining whether negligent acts are properly attributable to a defendant as vessel.13  ____________________ 12. As noted, the tugs that towed the barges were captained and crewed by employees of Woods Hole, which supplied the tugs. These employees did not handle the lines on the barges; under union rules, only carpenters/scowmen employed by A-K (such as Morehead) did. 13. This mix of responsibilities might, in other cases, expand the range of possible remedies available to an injured employee, who must then choose between the mutually exclusive regimes of the LHWCA and Jones Act. See Chandris, 115 S. Ct. ___ ________ at 2183-84 (citing McDermott Int'l, Inc. v. Wilander, 498 ______________________ ________ U.S. 337, 347 (1991)). In Southwest Marine, Inc. v. Gizoni, ______________________ ______ 502 U.S. 81 (1991), the Supreme Court held that a shipyard rigging foreman who handled lines connecting floating platforms to vessels under repair was not precluded as a matter of law from seeking a tort remedy under the Jones Act merely because ship repairers are among those jobs specifically enumerated under the LHWCA. See id. at 89 ("By ___ ___ its terms the LHWCA preserves the Jones Act remedy for vessel crewmen, even if they are employed by a shipyard. A maritime worker is limited to LHWCA remedies only if no genuine issue of fact exists as to whether the worker was a seaman under the Jones Act.").  Morehead withdrew his Jones Act claim, presumably because he did not believe he could establish Jones Act -18- 18 VI. Lower Court Precedent VI. Lower Court Precedent While the Supreme Court has said little about dual capacity cases beyond giving approval to the suing of dual capacity defendants in their vessel owner capacity, some circuits have decided cases similar to ours. They have asked whether the alleged negligence was due to the defendant qua employer or qua vessel, with recovery allowed only in the latter instance. And, principles borrowed from Scindia have _______ been applied to harbor workers as well as longshore workers. Applying Scindia to a dual capacity defendant raises _______ questions even in the longshoring context. For example, if a defendant is aware of a defect in the work area as stevedore employer, should such awareness also be attributed to it as vessel owner? And as we note supra, Scindia and Keller _____ _______ ______ emphasized a vessel owner's reliance upon the presumed expertise of the stevedore, an independent contractor. Where the vessel owner is also the stevedore, is it reasonable to attribute such reliance?  ____________________ seaman status. Nonetheless, Morehead has attempted to focus our attention on the vessel-type responsibilities that Breault performed in the period before the injury, as discussed infra. While an emphasis on vessel-type duties may _____ be appropriate for the fact-specific inquiry into seaman status, we place little weight on this attempt to bifurcate vessel and construction activities when these workers were hired to perform both. The definition of a covered employee under the LHWCA excludes "a master or member of a crew of any vessel." 33 U.S.C. 902(3). It seems inconsistent with this exclusion for Morehead to buttress his claim under the LHWCA with arguments portraying a fellow employee, Breault, as if he were a member of the crew of the vessel. See infra. ___ _____ -19- 19 Concerns of this nature led the Second Circuit in Fanetti v. Hellenic Lines Ltd., 678 F.2d 424 (2d Cir. 1982), _______ ___________________ cert. denied, 463 U.S. 1206 (1983), to indicate that a _____________ longshore worker's claim against a dual capacity defendant would be analyzed differently from a claim against a separate shipowner brought by the employee of an independent stevedore. In Fanetti, a longshore worker was injured on _______ deck by an unsafe condition. The dual capacity defendant argued that 1) in its role as employer-stevedore, it was primarily responsible for the safety of the workplace, and 2) as vessel owner, it should be able to rely upon its expertise as stevedore, thereby avoiding liability as vessel for the negligence.  The Second Circuit rejected the defendant's attempt to escape liability in negligence as vessel by seizing its "employer hat." Relying on a dissent by Judge Friendly in Canizzo v. Farrell Lines, Inc., 579 F.2d 682, 687 (2d Cir.) _______ ____________________ (Friendly, J., dissenting), cert. denied, 439 U.S. 929 _____________ (1978), the court of appeals ruled that a vessel assumes a greater duty of care when there is no independent employer _______ ___________ responsible for workplace conditions, upon whom the vessel owner may rely to oversee the safety of the workplace on board. See Fanetti, 678 F.2d at 428 (citing Canizzo, 579 ___ _______ _______ F.2d at 689-90). -20- 20 Rearranging duties of care as in Fanetti raises serious _______ problems, discussed hereafter, by enlarging an employer's tort liability beyond the purposes of the 1972 Amendments. Cf. Howlett, 114 S. Ct. at 2063. Fanetti, moreover, was ___ _______ _______ decided before Jones & Laughlin was handed down in the _________________ Supreme Court. We do not think that the Second Circuit today would endorse Fanetti's broadened duty of care, given the _______ Supreme Court's remark "that a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' capacity." Jones & Laughlin, 462 U.S. at 531 n.6. This comment suggests ________________ that the Court expected the limited vessel liability in Scindia to carry over to dual capacity situations as well. _______ No later case from the Second Circuit, nor from any other circuit, has been called to our attention following Fanetti's _______ enlargement of a vessel's duty in a dual capacity situation.14 Cf. Guilles, 12 F.3d at 383, 387 (a recent ___ _______ Second Circuit decision citing Fifth Circuit authority contrary to Fanetti and ruling only that a valid cause of _______ action under section 905(b) existed, where the parties had  ____________________ 14. Fanetti might have reached the same result of vessel _______ liability without applying a broader duty of care. The defendant did not dispute that the vessel's crew created the hazard while performing work unrelated to longshoring operations. See Fanetti, 678 F.2d at 426. In this ___ _______ situation, the defendant qua vessel arguably had active control over the crew and knew or should have known about the injury-causing actions, making it liable even under the Scindia standards. _______ -21- 21 stipulated to the vessel's negligence). Whether or not termed dicta, we do not feel free to overlook the Court's statement in Jones & Laughlin.  ________________ Contrary to Fanetti, the Fifth Circuit, which has _______ decided a great number of LHWCA cases, has allocated the same vessel duties of care to dual and single capacity defendants. It regards this approach as in keeping with the Supreme Court's limiting of a vessel's duty of care (e.g., Scindia ____ _______ and Jones & Laughlin), and with Congress' intent to provide ________________ injured workers the same remedies, regardless of whether their employer or another happens to be the legal owner of the vessel.15  The seminal Fifth Circuit case was Castorina v. Lykes _________ _____ Bros. S.S., 758 F.2d 1025 (5th Cir.), cert. denied, 474 U.S. ___________ ____________  ____________________ 15. Other courts have followed suit. See, e.g., Halpin v. ___ ____ ______ Atkinson-Kiewit, J.V., 894 F. Supp. 486 (D. Mass. 1995) ______________________ (applying Scindia duties and denying defendant's motion for _______ partial judgment on the pleadings); DiGiovanni v. Traylor __________ _______ Bros., 855 F. Supp. 37 (D.R.I. 1994), appeal docketed, No. _____ _______________ 94-1775 (1st Cir. July 27, 1994) (finding no violation of Scindia duties where hazard was obvious following "turnover" _______ of the vessel, defendant as vessel lacked "active control" over or knowledge of leak from equipment placed aboard for employment operations, and the circumstances did not give rise to a duty to intervene); Koernschild v. W.H. Streit, ___________ _____________ Inc., 834 F. Supp. 711 (D.N.J. 1993) (applying Scindia duties ____ _______ and denying summary judgment to the defendant where factual dispute existed concerning the plaintiff's awareness of the hazard); Coats v. Luedtke Eng'g Co., 744 F. Supp. 884 (E.D. _____ __________________ Wisc. 1990) (deeming "employer" responsible for providing employee a safe passageway to his job on the vessel, and granting summary judgment to the defendant given its lack of "active control" as vessel over a condition off-board the vessel). -22- 22 846 (1985). There, a longshore worker exposed to asbestos during cargo operations alleged that his employer-vessel owner knew of the harm qua vessel and failed to make the vessel safe. The Fifth Circuit stated that the LHWCA compensation scheme "requires us to separate the negligence of the shipowner and that of the stevedore, even when the shipowner performs its own stevedoring activities." Id. at ___ 1033. Noting that the alleged harm had arisen during stevedoring activities, the court refused to impute any knowledge of this danger by the employer to it as vessel. It explained: To impute this knowledge to a shipowner- employer would be to hold it liable in tort for damages arising from its negligence as stevedore, and effectively to eliminate the exclusivity provisions of sections 905(a) & (b). This result is contrary to the language and purpose of the Act as amended. We therefore hold that the duty owed by a shipowner to a longshoreman under section 905(b) is that established by Scindia and its progeny; _______ this duty is neither heightened nor diminished when the longshoreman is employed directly by the vessel. Id.; accord Tran v. Manitowoc Eng'g Co., 767 F.2d 223, 228 ___ ______ ____ ____________________ (5th Cir. 1985). On the facts of Castorina, it was relatively easy to _________ apply the Scindia standard to the shipowner-employer. In a _______ later case, the Fifth Circuit applied Scindia in a more _______ complex situation involving a harbor worker. In Levene v. ______ Pintail Enters., 943 F.2d 528 (5th Cir. 1991), cert. denied, _______________ ____________ -23- 23 504 U.S. 940 (1992), the injured employee was a heavy equipment operator who performed other maritime tasks as well. A captain had instructed Levene to untie another owner's barge, which blocked access to the particular barge they had been instructed to pick up. Levene was injured on the other owner's barge, where grease and scrap materials were present on the deck. See id. at 530.  ___ ___ Applying the Scindia duty of turnover and the duty _______ arising from active control over a dangerous condition, the Levene court rejected the employee's claim. The court ______ explained that Scindia did not mandate "extending the duty of _______ a shipowner to protection against hazards on another ship." Id. at 534. "[W]e decline to fashion a general standard of ___ 'reasonable care' that would require a shipowner to protect against any and all hazards a longshoreman might encounter in the course of his work." Id. Further, the court did not ___ view "the fleeting contact between Pintail [the employer- vessel owner] and the BB-242 [the separate owner's barge] as the kind of control that could result in a finding of liability." Id. at 535. It noted that the duty arising from ___ active control over a hazardous condition may be triggered when the dangerous condition is on the vessel itself. See ___ id. (discussing Masinter v. Tenneco Oil Co., 867 F.2d 892, ___ ________ ________________ 896-97 (5th Cir. 1989), a non-dual capacity case in which the vessel crew was solely responsible for placing a stairway in -24- 24 a way that caused injury to a worker, and the vessel was "contractually bound to conduct the drilling operations and ____________________ remained in control of the vessel to effectuate this obligation"). Even though the captain "temporarily was in 'command'" of both the vessel and the separate owner's barge, the court found that this did not rise to the level of active control required. Id. ___ VII. Resolving This Case VII. Resolving This Case We agree with the Fifth Circuit, for similar reasons, that the duties of care described in Scindia should be _______ applied in dual capacity cases insofar as the facts allow. To do so, a court may have to divide the employer-shipowner into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in Scindia. A court may sometimes _______ be assisted in this process by the defendant's internal employment arrangements assigning certain personnel to the "vessel" side of its operation. On occasion, however, the duties and work arrangements pertaining to a suing harbor worker may be so foreign to those in Scindia's stevedoring _______ context that Scindia's analysis will become no more than a _______ point of departure. Nonetheless, Scindia's general approach, _______ at least, can be followed and, in many cases, some or all of its express analysis may be useable. -25- 25 The statutory language and the legislative history of the 1972 and 1984 Amendments plainly evidence Congress' intent that the worker's compensation scheme be the primary remedy for all covered workers, regardless of an employer's commercial practice in regard to vessel ownership. See 33 ___ U.S.C. 905(a) (exclusiveness of employer's liability); 1984 U.S.C.C.A.N. at 2740 ("In the Committee's view, the Longshore Act should be the primary source of compensation for covered _______ workers who are disabled or who may die as a result of a job- related injury or disease.") (emphasis supplied); H.R. Rep. No. 92-1441, 92d Cong., 2d Sess., reprinted in 1972 _________ __ U.S.C.C.A.N. 4698, 4705 ("[T]he bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services . . . . The Committee's intent is that the same ____ principles should apply in determining liability of the __________ vessel which employs its own longshoremen . . . as apply when an independent contractor employs such persons.") (emphasis supplied). The 1972 Amendments carefully balanced the concerns of employers, vessels, and covered workers. We are not disposed to upset that balance by expanding the liability of employers that act simultaneously as vessel owners, when the statute does not call for such a reading and the Supreme Court has cautioned against it.  -26- 26 As already observed, Scindia will sometimes afford less _______ direct guidance on those duties owed to harbor workers than it does on those owed to longshore workers. Courts will need to decide, on a case-specific basis, whether the harbor worker's employment arrangement sufficiently resembles that in Scindia to make particular specifics germane.  _______ Here, the employment arrangement is sufficiently analogous to make Scindia a useful guide. The Scindia Court _______ _______ reasoned that once longshore workers came aboard and began carrying out their cargo duties under a stevedore's supervision, the vessel itself had no general duty to exercise reasonable care to inspect for unsafe workplace conditions; rather, it could rely on the longshore worker's employer to do so. See Scindia, 451 U.S. at 172. Here, A-K ___ _______ hired harbor workers through the local carpenters' union and, as their employer, supervised them as they tended the barges, handling the lines and carrying out construction activities thereon. Both types of activities construction and scowmen's work were assigned to them and were performed for A-K qua employer. Workers like Morehead received their daily instructions from A-K's carpenter-foremen, while A-K's project safety manager met periodically with them to discuss site-specific safety issues. Therefore, Scindia's principle _______ of limited liability of the vessel sensibly and logically applies, because the employees effectively assumed control of -27- 27 the barges working under A-K in its capacity as their employer. A-K qua shipowner had no separate captain and crew assigned to the barge. The allegedly negligent conditions (the open hatch and the absence of warnings) were not attributable to the errors of separate maritime agents acting specifically for the vessel. Rather the alleged acts of negligence were those of fellow harbor workers acting within the scope of their daily employment for the employer. Cf. 33 ___ U.S.C. 905(b) (prohibiting liability of an employer-vessel owner for acts "caused by the negligence of persons engaged in providing stevedoring services to the vessel"). Morehead does not assert any breach of the Scindia _______ "turnover" duty (e.g., that A-K, as vessel owner, turned over ____ the barge to the harbor workers knowing or with the duty to have known, of some defect in the barge that later caused injury). Morehead argues only that we should deem that A-K as vessel violated duties it owed him because, at the time he was injured, A-K as vessel (rather than A-K as employer) is asserted to have had "active control" over or "actual knowledge" of the open hatch. Cf. Howlett, 114 S. Ct. at ___ _______ 2063 (noting appellant confined arguments to breach of turnover duty to warn); Elberg, 967 F.2d at 1150 (noting ______ appellant confined arguments to breach of duty to intervene). Equating employment for worker's compensation purposes solely with construction activity, he asserts that no construction -28- 28 purpose, hence no employment purpose, was being pursued at the time of his injury. He draws support from the district court's findings that the barges were set alongside the pier and were not carrying construction equipment. Morehead emphasizes that A-K had instructed Breault to open the hatch to air the barge out so that A-K could exercise what Morehead argues was a vessel function having a marine surveyor examine the barge before returning it to the owner. He further claims that A-K's safety manager or other carpenter foremen knew or should have known that the open hatch was a potentially hazardous condition. Resting on purported agency principles, Morehead asks us to assign these employees' acts to A-K in its vessel capacity, on the theory that A-K in its vessel rather than employer capacity had control over or knowledge of the open hatch and the failure to warn about it. A-K responds that Breault was performing employment duties when he opened the hatch and when he threw the line to Morehead before the accident. Like Morehead, Breault had been hired both for carpenter and scowman duties. As typical in the case of harbor workers, as distinct from land-based carpenters, the men were expected as part of their employment duties to lend a hand with supporting maritime chores as well as to pursue their particular construction trade. A-K maintains that its "active control" over or knowledge about the open hatch into which Morehead fell is therefore -29- 29 attributable to it as employer, not as vessel since the hatch was opened (presumably by Breault) and the line thrown in the course of harbor worker duties which both men were regularly hired to perform. We agree with A-K that, for present purposes, the barges tended by its carpenters/scowmen were operated within A-K's control and knowledge qua employer. The barges, which were ____________ Breault and Morehead's workplace, can be analogized to the areas of a vessel taken over by longshore workers in the Scindia setting. Under the principles of that case, the _______ stevedore or, in a dual capacity case, the employer in a stevedore capacity is ordinarily liable for the safety of the workplace and for any injuries that occur. The vessel, or the employer in its vessel capacity, is not implicated except in the unusual circumstance that the vessel itself continues to exercise active control over the work area. We recognize that a competing analysis is possible, which, however, we reject. A court could make an attempt to ascribe Breault's and Morehead's specific activities relative to Morehead's injury either to their employer or to the vessel, depending on how the court chose to classify the objectives that those activities were thought to serve. One could inquire whether the hatch was opened to "help" the vessel (i.e., to air it in preparation for returning it to ____ the owner) rather than in furtherance of some construction -30- 30 activity. If so, the defendant qua vessel might be held liable for any negligence. Such an analysis, however, would involve courts in slippery semantical debate. Is an accident while tying up a barge at a construction site in furtherance of a "construction" objective or a "vessel" objective? If both objectives are being served, which predominates? And how does one square the fact that the employees here were hired by the employer for scowmen not just carpenter duties? Harbor workers are, after all, by definition, employees whose paid duties include maritime components. As noted, the statute makes the employer's worker's compensation liability "exclusive and in place of all other liability . . . ." 33 U.S.C. 905(a). The legislative history and the Court's precedents since 1972 make worker's compensation the primary remedy for an injured employee. The exception in section 905(b) for third-party negligence, narrowed in 1984,16 explicitly requires a finding of vessel ______ fault. We would be disregarding Congressional intent and might even be returning in the direction of the Sieracki ________ doctrine which did not require such a showing, see supra n.6, ___ _____ if we were to attribute some of the regular duties that a harbor worker is employed to perform to the vessel, because  ____________________ 16. Cf. Roach v. M/V Aqua Grace, 857 F.2d 1575, 1580 (11th ___ _____ _______________ Cir. 1988) ("While this [1984] amendment does not disturb the holding of Jones & Laughlin Steel Corp., it does indicate a _____________________________ Congressional intent to limit invocation [sic] of the dual capacity doctrine under the Act."). -31- 31 of their speculative seaman-like character, and only the residue to the employer. This approach would greatly expand a defendant's liability qua vessel in a work arrangement not too different from that in Scindia, i.e., one where the _______ ____ employees have effectively taken over the vessel to carry out their employment duties under their employer's supervision. A similar expansion of liability would follow from too easily assigning any knowledge acquired by A-K employees in the regular course of employment (such as the carpenter foremen or worksite safety manager) to A-K in a vessel capacity. Neither the statute nor case law supports such an approach, which, on the present facts, would leave this worker's compensation statute as a strange hybrid combining mandated compensation coverage with a widespread license for covered employees to sue because of the negligence of their supervisors and fellow employees within the workplace. One of the essential purposes of the 1972 and 1984 Amendments was to provide employees and employers with a greater degree of certainty as to the coverage in effect. The legislative history of the 1984 Amendments documents this concern: [T]he situation in which a worker may be covered at one time, and not covered at another, depending on the nature of the work which the worker is performing at the time of the injury must be avoided since such a result would be enormously destabilizing, and would thus defeat one -32- 32 of the essential purposes of these amendments. 1984 U.S.C.C.A.N. at 2736-2737. A "functional" interpretation, hinging the type of liability on the nature and purpose of the duties being performed by covered employees at any given time, would increase uncertainty and the frequency of disputes over the scope of coverage. As Morehead's and Breault's employment contemplated that they would alternate frequently between construction and linehandling, a single, overall classification of their duties is most appropriate for determining the types of remedies available. Cf. Gay, 915 F.2d at 1011 ("[T]o deny ___ ___ Gay [the employee] a cause of action in the morning but to grant him one in the afternoon is to make his rights under the Act as random and indiscriminate as the sea herself. This sort of incertitude is precisely what Congress attempted to eliminate from the LHWCA in both its 1972 and 1984 amendments.") (footnote omitted); cf. Chandris, 115 S. Ct. at ___ ________ 2187 ("In evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ 'a "snapshot" test for seaman status, inspecting only the situation as it exists at the instant of injury'. . . . [A] worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured.") (citations omitted).  -33- 33 Cases will, of course, arise from time to time involving an injury that was negligently caused by someone acting as the agent of the vessel owner rather than of the employer.17 Here, however, we see nothing requiring the district court to find that Breault, in leaving open the hatch, acted in any capacity other than as Morehead's fellow employee pursuing assigned harbor worker duties rather than as A-K's agent in its distinct shipowner's capacity. Morehead and Breault were hired to perform both construction and scowmen duties. A carpenter-supervisor instructed Breault to open the hatch. A-K's project safety manager generally oversaw the safety of work operations. Morehead has not shown why, in these circumstances, A-K in its distinct capacity as owner of the vessel rather than as his employer, may have breached a duty of care to protect him against the open hatch. We conclude that the district court correctly viewed the open hatch as a condition temporarily created by A-K as employer, and affirm the district court's judgment in favor of A-K. So ordered. __________  ____________________ 17. Cf. Pichoff v. Bisso Towboat Co., 748 F.2d 300, 302-03 ___ _______ _________________ (5th Cir. 1984) (ruling in a dual capacity case that a general manager who ordered a hurried inspection of a fuel tank leak and failed to provide adequate lighting was acting as an agent of the vessel). -34- 34 - Concurring Opinion Follows - - Concurring Opinion Follows - -35- 35 SELYA, Circuit Judge (concurring). Under existing SELYA, Circuit Judge (concurring). ______________ Supreme Court precedent, this is a close and a vexing case. A large part of the problem is that the Court's language in Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 530-32 ____________________________ _______ & n.6 (1983) whether deemed a holding or a considered dictum forces judges who are called upon to decide "dual capacity" LHWCA cases to engage in a legal fiction, pretending that a single entity (the injured person's employer) is really two distinct and separable entities (employer and vessel owner pro hac vice). In my view, this ___ ___ ____ self-induced schizophrenia muddles the law and disrupts the delicate balance that Congress labored to strike between the entitlement of stevedores and others similarly situated to workers' compensation benefits, and the entitlement of employers who provide that coverage to immunity from negligence suits. In short, I believe that Congress should have been taken literally when it wrote that an employer's responsibility to furnish workers' compensation benefits under the LHWCA is "exclusive and in place of all other liability of such employer to the employee." 33 U.S.C.  905(a). This reasoning leads me to conclude, with all respect, either that Congress inadvertently muddied the waters in phrasing LHWCA 905(b), or, alternatively, that Jones & ________ Laughlin was wrongly decided. Still, I recognize that the ________ -36- 36 Supreme Court's opinion is binding on this court, and that we therefore must undertake what Judge Campbell charitably terms "an elusive quest." Ante at note 11. Once reconciled to ____ that necessity, I can in good conscience join this court's cogent opinion. I write separately, however, to urge the Supreme Court and Congress to reflect upon the mind games that Jones & Laughlin particularly as applied to harbor _________________ workers compels us to play, and, hopefully, to revisit the question of whether "dual capacity" employers should be liable at all in negligence actions brought by their employees. Dissenting opinion follows  Dissenting opinion follows  -37- 37 CYR, Circuit Judge (dissenting). As I am in CYR, Circuit Judge (dissenting). ______________ fundamental disagreement with the treatment given the duties of care incumbent upon dual capacity LHWCA employers by the en banc court under the Supreme Court decision in Scindia, I _______ respectfully dissent. I Two years after its seminal decision in Scindia, see _______ ___ supra Section V (en banc opinion), the Supreme Court held _____ that an injured longshore worker who receives LHWCA compensa- tion benefits is not barred from bringing a negligence action against his vessel-owner employer under section 905(b), notwithstanding the seemingly unqualified "exclusivity" provision in section 905(a) that the sole liability to which maritime employers may be subjected is LHWCA compensation benefits. See Jones & Laughlin, 462 U.S. at 530-31; see also ___ ________________ ___ ____ supra note 5 (en banc opinion). Beyond the conclusive _____ contextual support for this holding, the relevant legislative history confirms a congressional intendment "that the rights of an injured longshoreman . . . should not depend on whether he was employed directly by the vessel or by an independent contractor." Jones & Laughlin, 462 U.S. at 531-32 (quoting _________________ H.R. Rep. No. 92-1441).1  ____________________ 1. The full House Report excerpt states:  The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is -37- 37 Without further elaboration, the Jones & Laughlin Court _________________ appended a conclusory footnote ("footnote 6") to its holding: "Of course, [905(b)] does make clear that a vessel owner acting as its own stevedore is liable only for negligence in its `owner' capacity, not for negligence in its `stevedore' capacity." Id. at 531 n.6. The en banc court interprets ___ footnote 6 as the Supreme Court's endorsement of a legal fiction central to the present controversy: a dual capacity employer engaged in maritime construction presumptively operates in two wholly discrete capacities (i.e., vessel owner and construction company). I respectfully disagree.  ____________________ employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Supreme Court, in Reed v. S.S. Yaka, ____ _________ 373 U.S. 410 (1963), and Jackson v. Lykes Bros. _______ ___________ Steamship Co., 386 U.S. [731] (1967), held that the _____________ unseaworthiness remedy is available to the injured employee. The Committee believes that the rights of an injured longshoreman or ship builder or repairman should not depend on whether he is employed directly by the vessel or by an independent contractor. Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing long- shoring services. Similar provisions are appli- cable to shipbuilding or repair employees employed directly by the vessel. The Committee's intent is ___ ___________ ______ __ that the same principles should apply in deter- ____ ___ ____ __________ ______ _____ __ ______ mining liability of the vessel which employs its ______ _________ __ ___ ______ _____ _______ ___ own longshoremen or ship builders or repairmen as ___ ____________ __ ____ ________ __ _________ __ apply when an independent contractor employs such _____ ____ __ ___________ __________ _______ ____ persons. _______ H.R. Rep. No. 92-1441, 92d Cong., 1st Sess. 7-8, reprinted in _________ __ 1972 U.S.C.C.A.N. at 4705 (emphasis added).  -38- 38 First, footnote 6 is unelucidated dictum. See Dedham ___ ______ Water Co., Inc. v. Cumberland Farms Dairy, Inc., 972 F.2d ________________ _____________________________ 453, 459 (1st Cir. 1992) ("Dictum constitutes neither the law of the case nor the stuff of binding precedent."). Although great deference normally is accorded considered Supreme Court dicta, see, e.g., Bank of New England Old Colony, N.A. v. ___ ____ _____________________________________ Clark, 986 F.2d 600, 603 (1st Cir. 1993), the only question _____ of statutory interpretation confronting the Court in Jones & _______ Laughlin was whether the LHWCA imposed any duty of care at ________ ___ ____ __ ____ __ all upon dual capacity vessel owners, since the parties were ___ in agreement that the defendant vessel owner would be liable for its negligent conduct absent any such per se immunity ___ __ prescribed by statute.2 Not only did the parties in Jones & _______ Laughlin not brief the complex legal issue presently before ________ us, but there is no exegetic discussion either in footnote 6 or elsewhere in the Jones & Laughlin opinion of the _________________ legal issue itself, the LHWCA's legislative history, or supportive Supreme Court precedent. See Heck v. Humphrey, ___ ____ ________ 512 U.S. 477, 114 S.Ct. 2364, 2370 (1994) (rejecting Court's own dictum in prior opinion which "had no cause to address, and did not carefully consider, the damages question before us today").  ____________________ 2. Longshoreman Pfeifer had slipped and fallen while on board a barge owned by his employer, which had "negligently failed to remove [ice] from the gunnels." Jones & Laughlin, ________________ 462 U.S. at 526.  -39- 39 More importantly, even if footnote 6 were to be consid- ered binding precedent, its curt conclusion begs the essential question: in defining the duties of care, how are the courts to determine in what conditions particular negligent conduct is to be considered traceable to a dual capacity employer qua vessel owner? Far from creating or ___ endorsing a presumptive legal fiction, footnote 6 may simply impart the Court's view that a dual capacity employer in some future case might yet be able to demonstrate an efficient bifurcation of its statutory duties of care under the LHWCA. The current circuit split on this issue thus indicates at the very least that the legal fiction purportedly endorsed by footnote 6 has not won universal acceptance in the lower courts. The Fifth Circuit has accepted footnote 6 as evidence that the Supreme Court meant to endorse an artificial legal construct deemed central to the LHWCA's integrity as a proto- typical workers' compensation statute. See Levene, 943 F.2d ___ ______ at 531 (citing Castorina, 758 F.2d at 1032-33 (noting: since _________ legislative history contemplates that all maritime employees receive the "same" remedy, "[w]e can find no reason to impose on a shipowner a greater duty of care toward longshoremen because the shipowner conducts its own stevedoring opera- tions")). That is to say, a contrary construction of section 905(b) would deprive dual capacity employers of their antici- -40- 40 pated return for assuming the burden of contributing to the section 904 workers' compensation scheme. The Second Circuit, on the other hand, has pointed out that attempting to fit dual capacity employers into the traditional Scindia mold causes serious anomalies and _______ artificialities not present in single capacity cases. See, ___ e.g., Fanetti, 678 F.2d at 428 ("[A] [jury] charge which ____ _______ relieves a shipowner of liability for a dangerous condition which was `known to the stevedore or to any of its employees' is clearly inappropriate where the shipowner, itself, is the stevedore.'") (quoting Napoli v. Hellenic Lines, Ltd., 536 ______ _____________________ F.2d 505, 508 (2d Cir. 1976)). For example, as the Second Circuit observed:  Where . . . there is no independent con- _____ _____ __ __ ___________ ____ tractor, it is part of the ship's duty to _______ __ __ ___ ______ ____ __ exercise reasonable care to inspect its ________ __________ ____ own workers' workplace, to remove grease spills, etc. In such a case there is no "independent contractor" with primary responsibility upon whom the ship may properly rely . . . . Things are very different when the longshoreman works for an independent stevedore who has primary responsibility for the workplace.  Id. (quoting Canizzo, 579 F.2d at 689-90 (Friendly, J., ___ _______ dissenting, in part)) (emphasis added). Although Fanetti _______ preceded Jones & Laughlin, whereas the Castorina decision _________________ _________ -41- 41 came after, there is no indication that the Second Circuit has altered its position.3 II II The en banc court embraces the presumptive "bifurcation" approach adopted in Castorina out of concern that the Fanetti _________ _______ option would eviscerate the 1972 LHWCA amendments' principal purpose: to offer all maritime employers maximum protection from unpredictable tort liability in return for their fixed monetary contributions to the LHWCA compensation fund. See ___ also DiGiovanni v. Traylor Brothers, Inc., 855 F. Supp. 37, ____ __________ _______________________ 42 (D.R.I. 1994) (same, citing by analogy to "exclusivity" provision in Rhode Island Workers' Compensation Statute, see ___ R.I. Gen. Laws 28-29-20 (1994)). Accordingly, the en banc court views the bifurcation fiction as the only means of achieving the congressional goal "that the rights of an  ____________________ 3. The en banc court notes that the Fanetti panel need not _______ have announced so broad a statement of the duties incumbent upon dual capacity employers. See supra note 14 (en banc ___ _____ opinion). In my view, this overlooks the purposes served by such statements: first, to explicate the court's rationale through reference to potential anomalies and inequities which might otherwise be thought to undermine its rationale; second, to provide guidance on remand. See, e.g., Scindia, ___ ____ _______ 451 U.S. at 156 (setting forth complete explication of duties of care for remand, some arguably inapposite to record facts). No Supreme Court or Second Circuit case either explicitly or implicitly overrules Fanetti. Cf. Guilles, 12 _______ ___ _______ F.3d at 387 (citing Levene only for the limited proposition ______ that non-longshore workers not specifically barred by the 1984 LHWCA amendments like harbor workers may bring suit against their dual capacity employers under the Jones & _______ Laughlin reasoning); cf. also supra Section VI (en banc ________ ___ ____ _____ opinion).  -42- 42 injured longshoreman . . . should not depend on whether he was employed directly by the vessel or by an independent contractor." H.R. Rep. No. 92-1441 (noting that the "same principles should apply in determining the liability of the vessel" in both single capacity and dual capacity cases). I find its reasoning unpersuasive.  First, though courts must attempt to discern legislative intent based on the statute as a whole, see Thinking Machs. ___ _______________ Corp. v. Mellon Fin. Servs. Corp., 67 F.3d 1021, 1024 (1st _____ _________________________ Cir. 1995), nothing in the LHWCA or its sparse legislative history provides conclusive support for the "evisceration" argument adopted today by the en banc court. As single capacity employers would continue to retain all their section 905(a) protections, the Fanetti approach may limit some _______ employers' LHWCA immunity but it certainly does not render the LHWCA exclusivity provision superfluous. See Mosquera- ___ _________ Perez v. INS, 3 F.3d 553, 556 (1st Cir. 1993) (no statutory _____ ___ provision should be interpreted as meaningless). Second, Jones & Laughlin itself demonstrates that the _________________ supposedly unlimited, pro-employer exclusivity provision in section 905(a) is far more flexible than the land-based workers' compensation statutes in most states, which in comparable contexts would not permit a worker to bring a negligence action against the employer as owner of the property on which the worker's injury occurred. See ___ -43- 43 generally 2A Arthur Larson, Workmen's Compensation Law  _________ ____________________________ 72.82, at 14-234 (1983).4 Thus, it seems reasonably clear that Congress did not envision section 905 as an exact analog to state workers' compensation schemes. Third, the cited House Report language appears immedi- ately after a discussion of Congress' intention to abrogate the Court's previous decisions in Reed v. Yaka, 373 U.S. 410 ____ ____ (1963), and Jackson v. Lykes Bros. Steamship Co., 386 U.S. _______ __________________________ 731 (1967), see supra note 1, which held that dual capacity ___ _____ employers were as vulnerable to "unseaworthiness" claims under the pre-1972 LHWCA as were non-employer vessel owners. Congress meant to eliminate the wasteful litigation burdening the courts under the pre-1972 LHWCA; viz., the "triangulation" in litigation caused by the confluence of a longshore worker's strict liability claim for "unsea- worthiness" against the vessel owner and the vessel owner's claim for indemnification from a negligent stevedore- employer.  Thus, in all likelihood the House Report's reference to "same principles" was simply meant as a caution that hence-  ____________________ 4. Many states do recognize a dual capacity doctrine  though in circumstances inapposite here where the employer acts in a non-landowner capacity. For example, a worker ___ _________ injured by a product manufactured by the employer would not be barred from bringing a product liability claim for breach of the duty owed the consuming public to make a reason- ______ ably safe product. See, e.g., Schump v. Firestone Tire & ___ ____ ______ _________________ Rubber Co., 541 N.E.2d 1040, 1042-43 (Ohio 1989).  __________  -44- 44 forth, by virtue of the 1972 amendments, both single capacity and dual capacity cases were to be subject to the same negli- gence liability principles, not to the heightened standards of care governing "unseaworthiness" claims a differential that would otherwise have afforded employees in dual capacity cases a decided advantage in litigation. See, e.g., Shaw v. _________ ___ ____ ____ North Pennsylvania R. Co., 101 U.S. 557, 565 (1879) ("No ___________________________ statute is to be construed as altering the common law further than its words import."). Therefore, even without indulging the "bifurcation" fiction adopted by the en banc court, it is entirely reasonable to point out that dual capacity employers, in return for assuming much more limited section 904 workers' compensation liability, obtained an important benefit from the 1972 amendments; that is, complete insulation from the much more onerous strict liability to which they had been exposed previously in actions for breach of the warranty of seaworthiness. Fourth, Congress may well have envisioned different duties of care for single capacity and dual capacity employers. Unlike their single capacity counterparts, dual capacity vessel owners presumably derive economic benefit as a result of their decision to act in a dual capacity. In fact, this economic benefit itself may well counterbalance any "heightened" duty of care attending their decision. A shipowner is, of course, at liberty to refrain from hiring an independent steve- -45- 45 doring contractor. Presumably it does so to save money. However, that saving is accomplished at the cost of not having an independent expert on board. As myriad cases in this field demonstrate, the presence of the expert independent steve- doring contractor furnishes the shipowner with significant protection, in the form of insulation from liability for its own acts which would otherwise attach. But the shipowner cannot save the premium and ___ _________ ______ ____ ___ _______ ___ still claim the protection. _____ _____ ___ __________ Fanetti, 678 F.2d at 428 (emphasis added).  _______ Indeed, permitting the dual capacity employer to compartmentalize its actual "knowledge" between its two artificial personae in these circumstances would undercut the primary LHWCA policy goal identified in Scindia. That is to _______ say, there would be no economic incentive for shipowner- employers to hire independent stevedoring companies, which generally possess greater expertise in conducting longshoring activities with maximum levels of worker safety. Such an artificial rule inevitably would increase the hazardous working conditions encountered by longshore and harbor workers, and thereby undermine the spirit of the LHWCA. Fifth, the en banc court's bifurcation fiction obviates any factfinding inquiry into the "dual capacity" employer's actual mode of operations. Under either Fanetti or Levene, _______ ______ single and dual capacity employers are subject to the "same" standards of care; the differences are purely circumstantial. The Scindia paradigm recognizes that a single capacity vessel _______ owner is subject to comparatively relaxed duties of care -46- 46 because it forfeits virtually all control over ensuing events once it turns its vessel over to another legal entity (and that entity's employees) in relation to which the vessel owner enjoys no presumptive right of control absent specific contractual arrangements to the contrary. On the other hand, as a general rule the notice or knowledge as well as the foreseeability attributable to a dual capacity employer will be greater simply because a vessel owner which hires its own longshore or harbor workers does not in fact "turn over" its vessel to a separate entity. Rather, the dual capacity employer remains in control at least to some extent (both in time and space) and often remains in total control of the entire vessel and its appurtenances throughout the relevant time period. Thus, the fuller range of knowledge and foreseeability normally accompanying constant and total control represents a compelling reason for broader accountability on the part of the dual capacity employer, consistent with general tort principles, see, e.g., Illinois Constructors Corp. v. Logan ___ ____ ____________________________ _____ Transp., Inc., 715 F. Supp. 872, 882 n.22 (N.D. Ill. 1989) ______________ (agent's knowledge is imputable to principal, exposing principal to direct liability in tort); People v. American ______ ________ Medical Ctrs. of Michigan, Ltd., 324 N.W.2d 782, 783 (Mich. ________________________________ Ct. App. 1981) (same), cert. denied, 464 U.S. 1009 (1983); _____ ______ -47- 47 Allen v. Prudential Property & Cas. Ins. Co., 839 P.2d 798, _____ ____________________________________ 806 (Utah 1992) (same).  Even a single capacity employer owner must shoulder the ongoing duty to intervene as necessary to correct hazardous conditions in any part of the vessel remaining within its control, as well as when it acquires actual knowledge of a developing hazard posed by the vessel's appurtenances (e.g., ____ an open deck hatch or a leaking powerpack), and knows that the independent stevedore's failure to remedy the hazard is plainly improvident. See Keller, 38 F.3d at 32; cf. also ___ ______ ___ ____ Melanson v. Caribou Reefers, Ltd., 667 F.2d 213, 214 (1st ________ ______________________ Cir. 1981) (noting that Scindia's "obviously improvident" _______ standard of care generally pertains only to hazards develop- ing in vessel's gear, rather than nonappurtenances like ____ cargo). By the opposite token, however, what can it matter whether a dual capacity employer knows, as it surely does, that its decision qua independent stevedore not to eliminate ___ a known hazard is or is not improvident? After all, a vessel can exercise control, and acquire knowledge, only ____ through its owner and crew, 33 U.S.C. 902(21) ("vessel" includes "agents" and "crew members"), and in single capacity cases the control exercised and the knowledge acquired by these agents normally must be imputed to the vessel.5   ____________________ 5. Indeed, the following language from the House Report severely undercuts the statutory interpretation proposed by the en banc court:  -48- 48 The apology for the dual capacity fiction might be more compelling were there some reality-based indication as to when the markedly different responsibilities incumbent upon dual capacity employers become engaged. But this is simply not the case, of course. Even the determinative one-time "turn over" in a single capacity case, which brings about a clearly distinguishable realignment of responsibilities in keeping with the change in control, bears no relevance in the dual capacity case. In the Jamestown Bridge construction project, for example, the control and use of some vessels, or discrete areas of various vessels, frequently alternated between an employer's vessel-operating employees and its  ____________________ [N]othing in the [LHWCA] is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.  So, for example, where the longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To ___ __________ recover, he must establish that: (1) the vessel put a foreign substance on the deck, or knew that it was there, and __ ____ ____ __ ___ _____ willfully or negligently failed to remove it; or (2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care under the circumstances. H.R. Rep. No. 92-1441 (emphasis added).  -49- 49 construction employees.6 Clearly, then, the dual capacity fiction presumes circumstantial settings which overlook the actual facts in many if not most cases.  At best, therefore, the Castorina fiction devolves into _________ a metaphysical exercise, at worst into an inducement to dual capacity employers to perpetuate hazardous conditions within their exclusive control. See Fanetti, 678 F.2d at 428. ___ _______ Furthermore, it runs directly counter to the clear statement of congressional intent in the LHWCA legislative history; viz., that the "same principles [i.e., the Scindia duties of ____ __________ _______ care] should apply in determining the liability of the vessel" in both single capacity and dual capacity cases. See ___ H.R. Rep. No. 92-1441.  Sixth, the mere fact that the 92d Congress reduced the tort liability exposure of LHWCA employers in certain  ____________________ 6. For example, in the companion en banc case, the employer, __ ____ Traylor Brothers, Inc., was required to use the BETTY F and the supply barge, alternately, as a means of transporting the crane, its operating employees and supplies to the designated work sites on Narragansett Bay or as an instrumentality for constructing the coffer dams. Sometimes, in fact, it appears that these discrete operating modes either merged or alternated with such frequency that it could not be ascertained with any confidence, even on the date of the accident, whether the Traylor Brothers' supply barge crew, or its construction team "alter ego," had custody and control of the deck of the supply barge. Cf. Masinter v. Tenneco Oil ___ ________ ___________ Co., Inc., 867 F.2d 892 (5th Cir. 1989) (noting that "the _________ present case does not involve a vessel owner 'turning over' the control of a vessel to a stevedore or independent contractor. Rather, [the vessel owner] was contractually bound to conduct the drilling operations and remained in control of the vessel to effectuate this obligation."). -50- 50 respects does not permit the extrapolation indulged by the en banc court; viz., Congress must have intended to accord employers the maximum protection from negligence liability _______ regardless of any actual differences in their respective levels of knowledge about, or capacities to control, the workplace. In so doing, the en banc court gives little recognition to the one presumptive principle of statutory interpretation plainly applicable here: the LHWCA "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." Reed, 373 ____ U.S. at 415 (emphasis added). See Voris v. Eikel, 346 U.S. ___ _____ _____ 328, 333 (1953); see also Hogar Agua y Vida en el Desierto v. ___ ____ ________________________________ Suarez-Medina, 36 F.3d 177, 181 (1st Cir. 1994) (remedial _____________ statutes are to be broadly construed).7 Consistent with this presumptive interpretation, unless dual capacity employers like A-K demonstrate some legislative purpose behind the  ____________________ 7. Generally, this interpretive rule operates to bring injured maritime workers within the workers' compensation scheme in circumstances where 904 is ambiguous. Insofar as maritime workers are deprived of other common law remedies under 905(a), a liberal interpretation is not invariably synonymous with one that is "favorable" in fact to maritime workers. In Reed, 373 U.S. 410 (1963), and Jackson, 386 U.S. ____ _______ 731 (1967), however, the Court made clear that this inter- pretive rule may be used to expand a covered worker's adjunct remedies under the LHWCA, beyond the remedy directly afforded under 904. The legislative history of the 1972 LHWCA amendments questions Reed, but only regarding the continued ____ availability of the "unseaworthiness" remedy against dual capacity employers, see supra note 1, leaving undisturbed ___ _____ Reed's pro-employee interpretive presumption in the face of ____ other unresolvable statutory ambiguities.  -51- 51 LHWCA that is either served by Castorina or disserved by _________ Fanetti, the benefit of the doubt would belong to the _______ plaintiff-employee.8  III III Absent controlling precedent or conclusive evidence of congressional intent, we must determine the particular duties of care to be borne by the dual capacity employer. See ___ Scindia, 451 U.S. at 165-66, 167 ("Section 905(b) did not _______ specify the acts or omissions of the vessel that would constitute negligence . . . . Much was left to be resolved  ____________________ 8. I share the common-sense assessment advanced in the concurring opinion, see supra, that the dual capacity fiction ___ _____ is unnecessarily cumbersome, but cannot agree that Congress intended, or the Jones & Laughlin Court should have held, _________________ that all tort suits against dual capacity employers were barred outright. First, the unambiguous second sentence in  905(b) ("If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.") prevented any such interpretation by the Court. By expressly restricting the permissible scope of such suits, this language unmistakably implies that there is no such outright bar of negligence suits by employees against their dual capacity employers. See Jones & Laughlin, 462 U.S. at 530-31. ___ __________________ Second, the concurring opinion suggests that the 92d Congress unintentionally created the present muddle in 1972, then surmises that Congress nonetheless intended the exclusivity provision as a total bar to dual capacity suits. Be that as it may, Congress amended the LHWCA in 1984, one year after the Jones & Laughlin decision, and enacted outright bars _________________ relating only to particular classes of dual capacity employers (e.g., shipbuilders). See, e.g., Guilles, 12 F.3d ___ ____ _______ at 386. Thus, Congress had the opportunity in 1984 to overturn the Jones & Laughlin decision in its entirety, yet _________________ chose to overrule it only in part. Consequently, a congres- sional intendment that some dual capacity employers are subject to suit under section 905 seems to me to be settled beyond serious question. -52- 52 through the `application of accepted principles of tort law and the ordinary process of litigation.'") (quoting H.R.Rep. No. 92-1441). Since legal fictions often overlook relevant realities in order to promote some greater systemic benefit, in my view a finding of dual capacity should be the exception, not the presumptive rule.9  Neither the Congress nor the Scindia Court could have _______ foreseen the recent, fast-paced evolution in maritime construction practices which has exacerbated the instant controversy. Ultimately, therefore, the Congress or the Supreme Court must provide a definitive response to the present conundrum. Until then, however, "the rights of an injured longshoreman . . . should not depend on whether he was employed directly by the vessel or by an independent contractor." Jones & Laughlin, 462 U.S. at 531-32.  ________________ It is for very good reason that the LHWCA did not invite the courts simply to presume an adequate segregation of the  ____________________ 9. See Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, ___ _________ ________________________ 92 (1934) (("[L]egal fictions have an appropriate place in the administration of the law when they are required by the demands of convenience and justice."); Pettibone Corp. v. _______________ Easley, 935 F.2d 120, 123 (7th Cir. 1991) ("Even legal ______ fictions have their limits."); Cruz v. Chesapeake Shipping, ____ ____________________ Inc., 932 F.2d 218, 227-28 (3d Cir. 1991) (noting that ____ maritime law creates legal fictions "for [] practical operational reasons"); United States v. Markgraf, 736 F.2d ______________ ________ 1179, 1187 (7th Cir. 1984) ("[F]or more than 200 years we have been told that the proper office of legal fictions is to prevent, rather than to create, injustices.") (citing 3 William Blackstone, Commentaries on the Laws of England 43 _____________________________________ (1768)), cert. dismissed, 469 U.S. 1199 (1985).  _____ _________ -53- 53 workplace-safety responsibilities incumbent upon maritime employers under the LHWCA, based merely on some informal or _____ ______ __ ____ ________ __ de facto bifurcation of its vessel-owner and construction __ _____ ___________ __ ___ ____________ ___ ____________ operations. Such a presumption would allow, even encourage, __________ dual capacity employer operations to lapse into the types of tacit work arrangements which place employees at unnecessary risk; for example, where few workers, if any, understand which of their dual capacity employer's alter egos is ultimately responsible, through its own employees, for ___ monitoring, reporting and/or remedying developing hazards.  At most, therefore, bifurcation should be available as an affirmative defense, as to which the putative dual capacity employer bears the burden of proof. Scindia noted _______ that the vessel owner may surrender and entrust a discrete work area to a single capacity employer because the latter ______ ________ presumptively possesses not only the hands-on opportunity to monitor vessel workplace conditions, but also the required expertise in supervising workplace safety. See Keller, 38 ___ ______ F.3d at 29-30. On the other hand, since a dual capacity ____ ________ employer may or may not actually consign its workplace safety responsibilities to its "construction division," its bifurca- tion defense should not be allowed if, for instance, the dual capacity employer withheld such responsibilities from its construction division ab initio, or delegated them without __ ______ the clarity and authority reasonably required to enable their -54- 54 reliable discharge. Cf. id. at 32 ("a post-'turnover' duty ___ ___ may arise if the vessel owner was obligated, by contract, statute or custom, to monitor stevedoring operations for the purpose of detecting and remedying unsafe conditions"). For example, the slipshod arrangements in place in the companion cases now before the en banc court were of a type that could do nothing to encourage, let alone develop, the expertise necessary to enable a dual capacity employer's "construction division" reliably to discharge its delegated workplace- safety responsibilities along the lines touted in Scindia.  _______ Consequently, in my view the first step in establishing the actual bifurcation needed to sustain a dual-capacity employer's affirmative defense would be to demonstrate, either through an express delegation of responsibility, or by way of an implied delegation based, for example, on evidence that the dual capacity employer's on-site construction division supervisors customarily made workplace safety deci- sions of a type and magnitude adequate to indicate that reasonably reliable prophylactic measures would be undertaken to prevent workplace mishaps of the sort experienced by the plaintiff-employee.  Secondly, once a dual capacity employer has made the prima facie showing that primary responsibility for workplace safety had been adequately delegated to its "construction division," the Scindia rationale would contemplate that the _______ -55- 55 injury sustained by the plaintiff-employee have occurred in a workplace area not under the "active control" of the dual capacity employer's "vessel division" (or its vessel crew) during any appreciable pre-injury period after the hazardous condition first developed. See Scindia, 451 U.S. at 167 ___ _______ (noting that vessel may be liable for its negligent conduct "in areas . . . under the active control of the vessel during the stevedoring operations"); Fanetti, 678 F.2d at 429 _______ (noting that the 1972 LHWCA amendments "neither expressly nor implicitly purport[] to overrule or modify the traditional rule that the longshoreman may recover the total amount of his damages from the vessel if the latter's negligence is a contributing cause of his injury, even if the stevedore, whose limited liability is fixed by statute, is partly to blame") (quoting Edmonds v. Compagnie Generale _______ _____________________ Transatlantique, 443 U.S. 256, 264 (1979)).  _______________ The rationale for such a requirement seems unimpeach- able: an employer may not use the dual capacity fiction to circumvent LHWCA tort liability by artificially compartmentalizing its actual knowledge. Id. at 430 ______ _________ ___ ("[R]equiring trial judges to give juries instructions about the shipowner's right to rely upon an expert contractor who, in fact, was not there . . . is schizophrenic and the predictable effect upon the jury one of bafflement."). Since dual capacity employers that utilize vessels to perform their -56- 56 maritime construction activities may never engage in a one- time turnover of any discrete area of the vessel (as would the single capacity vessel owner in the more traditional stevedoring context), a rational factfinder reasonably could conclude that the area within which the hazardous condition developed had been jointly or interchangeably used by the dual capacity employer's vessel division and its construction division employees to such an extent that the dual capacity employer had never surrendered "active control" of the injury site to its construction "division." Thus, were there to be a remand in this case, the record might enable a reasonable finding that agents of A-K's "construction division" exclusively and continuously controlled the barge from the time the hazardous condition first developed until a few days later when Morehead fell into the open hatch.  Once a dual capacity employer satisfies the two aforementioned components in its burden of proof, tort liability could not be imposed absent showings by the plaintiff-employee that the employer had acquired (i) actual knowledge of the developing hazard in an area no longer within the employer's "active control" and (ii) notice that the failure of its construction division to remedy the hazard was "obviously improvident." Scindia, 451 U.S. at 174-75. _______ Thus, the dual capacity employer would remain responsible for monitoring all areas of the vessel for developing hazards, -57- 57 even though it is allowed to rely upon its construction division, in the first instance, to remedy hazards within areas under the "active control" of its construction division.  Actual knowledge of a developing hazard normally would be imputed to a corporate dual capacity employer if its agents or employees acquired actual knowledge of the developing hazard. Under the "obviously improvident" standard, liability also could be imputed to the dual capacity employer based on extrinsic evidence as to the obviousness of the developing hazard and the length of time it remained unremedied.  Although the "obviously improvident" standard imported from Scindia entails a lesser duty of care than the "reason- _______ able care" required for actionable negligence, it nonetheless serves to diminish the grave risk that virtually any perfunctory designation of employees as "vessel-owner" workers may allow a dual capacity employer to shield itself from all tort liability. Thus, on remand the record in the present case might enable a finding that the decision not to close the open hatch for a few days was not "obviously improvident" even assuming responsibility for the decision were to be imputed to A-K. Cf. Scindia, 451 U.S. at 175, ___ _______ 178-79 (noting genuine factual dispute whether vessel owner was liable because it knew that stevedore's decision not to -58- 58 fix defective winch for two days had been obviously improvident, and remanding for further factual findings). In both cases before the en banc court, however, the district __ ____ court decisions were made in reliance on the Castorina _________ standard for defining the duties of care incumbent upon dual capacity employers. Since the ultimate findings as to whether breaches of the applicable duty of care occurred  necessarily were dependent upon how those duties were defined, I would remand the A-K case for further proceedings and/or specific factual findings on the defendant employer's affirmative defense of bifurcation. -59- 59