Kathleen Russo, wife of/and Herbert L. GAY, Plaintiffs–Appellants,

v.

BARGE 266 and Brown & Root U.S.A., Inc., Defendants–Appellees.

No. 89–3666.

United States Court of Appeals, Fifth Circuit.

Oct. 30, 1990.

David Greenberg, Nathan Greenberg, Greenberg & Dallam, Gretna, La., for plaintiffs-appellants.

James F. Holmes, Christovich & Kearney, New Orleans, La., for defendants-appellees.

Before GEE, RUBIN and DAVIS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A longshoreman and his wife appeal the judgment on a directed verdict against them in their action for damages arising from the alleged negligence of a vessel under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (1988). The district court found as a matter of law that the longshoreman was engaged in ship repair at the time of his injury, the owner *pro hac vice* of the barge on which he was working was his employer, and, in the alternative, that his injury was caused by the negligence of the work crew and its supervisor, all fellow longshoremen. Because we find that the longshoreman adduced sufficient evidence to warrant submission to the jury of both his status as a ship repairer and the negligence of his employer, we reverse.

## I

Herbert Gay worked for Brown & Root in Belle Chasse, Louisiana for over ten years. He was classified as a truck driver and light equipment operator, though his duties included loading and unloading barges from time to time. He was also occasionally assigned to pump water out of barges. Gay worked in a crew of twelve men under the direction of William "Bud" Kemp, general yard foreman. Kemp, in turn, answered to James Reese, the assistant maintenance manager, and L.D. Lowery, Brown & Root's operations manager.

Brown & Root contracted with Torch, Inc. to use Barge 266 to pick up a piece of pipeline construction equipment from the Livingston Shipyard at Orange, Texas and transport it to Brown & Root's yard at Belle Chasse. The barge was located in the Intracoastal Canal, approximately one mile away from Brown & Root's yard. The barge had settled on the bottom of the canal, apparently as the result of rainwater entering through openings in the deck, and could not be moved until the water had been pumped out.

On the morning of November 11, Reese and Kemp drove from the Brown & Root yard to the mooring of Barge 266. They noticed a two-by-twelve board on the ground near the barge. Reese and Lowery had used that or a similar board to gain access to the barge on an earlier visit. Reese and Kemp discussed whether a work crew could use the board to get the pumps onto the barge; they agreed that it could be done.

Later that day, Kemp instructed Gay and two other Brown & Root employees to load two pumps, each weighing more than one hundred pounds, onto a pickup truck and to transport them to the barge. When the crew arrived, it was raining lightly. Kemp told the crew to use the two-by-twelve board as a gangway to get the pumps onto the barge, even though cherry pickers and proper gangways were available at the Brown & Root yard a mile away. None of the crew dissented. The board was wet from the rain, and, when laid from the shore to the deck of the barge, a distance of some five or six feet, sat at a thirty degree incline. As Gay and another employee carried one of the pumps across the board to the barge, Gay slipped and fell into the water. The pump fell on top of him, punching a hole in his skull and seriously injuring his back.

Gay filed suit under § 905(b) of the LHWCA,[1] alleging that his injury was caused by Brown & Root's negligence, in its capacity as owner *pro hac vice* of Barge 266, in failing to provide safe access to the vessel. At the close of plaintiffs' case, the district court granted the defendants' motion for directed verdict. The court held that as a matter of law Gay was engaged in ship repair services at the time of his injury, and therefore his suit was barred by the language of § 905(b). The court also held that, even if Gay was not engaged in ship repair services, the only reasonable conclusion from the evidence was that Gay's injuries were caused solely by the negligence of Kemp and the work crew,

---

1. Section 905(b) provides:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to pro-

vide shipbuilding, repairing, or breaking services, and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

whom the court found to be fellow long-shoremen.

## II

Section 905(b) of the LHWCA allows a longshoreman injured due to the negligence of a vessel to bring a third-party tort action against the vessel owner.[2] As amended in 1984, however, that section prohibits suit by a person "employed to provide shipbuilding, repairing, or breaking services" against his employer, directly or indirectly, for the negligence of the vessel, even if his employer was "the owner, owner pro hac vice, agent, operator, or charterer of the vessel."

■ Brown & Root argues that, because Gay was repairing the barge at the time he was injured, he was "employed to provide" ship repairing services within the meaning of § 905(b). That conclusion is a non sequitur. Even if we assume for the moment that pumping out a barge is a "repair," it does not follow that Gay was "employed" to provide repair services. When classifying an employee for purposes of determining whether a suit under § 905(b) is barred, we look not only at what the employee was doing at the moment he was injured. We also look at whether the employee "regularly performs some portion of what is indisputably [ship-repair] work,"[3] or has been assigned for an appreciable period of time to do "substantial [ship-repair] work ... even though his assignment to it is not 'permanent,'"[4] just as we do in determining whether he is a longshoreman or, in Jones Act cases, a member of the crew of a vessel. If the employee's permanent duties, or his interim duties over an appreciable period, are such that he would be a covered ship repairer within the meaning of § 902(3) of the LHWCA,[5] then he is barred from bringing suit against his employer under § 905(b).

Two primary considerations recommend looking to the employee's overall duties or to his assignments for a significant time interval. First, it is consistent with Congress's purpose in amending the LHWCA in 1984 to foreclose suits in negligence against employers who have fulfilled their duty to provide injured employees with compensation benefits. To achieve that purpose, the specific statutory bar against § 905(b) actions by shipbuilders, ship repairers, and ship breakers must be as broad as coverage under the LHWCA itself. Otherwise, employees who regularly perform ship repair duties, for example, but who are injured while temporarily performing traditional longshoring duties, could still sue employer-shipowners in direct contravention of Congress's expressed intent.

■ Second, the § 905(b) bar is specific to the occupations listed: shipbuilders, ship repairers and ship breakers. Had Congress intended to foreclose suits by all covered employees against employer-shipowners, it could easily have done so. It did not. The Supreme Court's longstanding recognition that the LHWCA "focuses primarily on occupations"[6] supports our conclusion that Congress intended to bar suits only by workers in the occupations specified. Focusing solely on the employee's activity at the time of injury might bar suits by a whole host of workers in other maritime occupations who are injured while

**2.** *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 530, 103 S.Ct. 2541, 2547, 76 L.Ed.2d 768 (1983); *Tran v. Manitowoc Engineering Co.*, 767 F.2d 223, 226 (5th Cir.1985).

**3.** *Boudloche v. Howard Trucking Co.*, 632 F.2d 1346, 1347–48 (5th Cir.1980) (Unit A), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981).

**4.** *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1073 (5th Cir.1986) (en banc).

**5.** *See P.C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 82–83, 100 S.Ct. 328, 337, 62 L.Ed.2d 225 (1979);

*Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 273, 97 S.Ct. 2348, 2361, 53 L.Ed.2d 320 (1977); *Odom Constr. Co. v. United States Dep't of Labor*, 622 F.2d 110, 113 (5th Cir.1980), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981); *Boudloche*, 632 F.2d at 1347–48; *Schwabenland v. Sanger Boats*, 683 F.2d 309, 312 (9th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *Graziano v. General Dynamics Corp.*, 663 F.2d 340, 343–44 (1st Cir.1981).

**6.** *Caputo*, 432 U.S. at 273, 97 S.Ct. at 2361; *accord*, *Ford*, 444 U.S. at 80, 100 S.Ct. at 335–336.

temporarily performing repair work. Paraphrasing *Caputo*,[7] to deny Gay a cause of action in the morning but to grant him one in the afternoon is to make his rights under the Act as random and indiscriminate as the sea herself. This sort of incertitude is precisely what Congress attempted to eliminate from the LHWCA in both its 1972 and 1984 amendments.[8]

The only testimony in this case that Gay performed ship repair work was that he did, from time to time, pump out barges. Whether pumping out a barge is "repair work" within the meaning of the statute, however, is a question of applying the law to the facts, and whether Gay regularly performed such duties is a pure question of fact.[9] Thus, both elements of the inquiry into whether Gay was a ship repairer are questions for the jury. A directed verdict on this issue was therefore appropriate only if, after considering all of the evidence and drawing all inferences therefrom in favor of the nonmoving party, the court was convinced that no reasonable jury could find in favor of the nonmovant.[10]

A reasonable jury, however, might easily have concluded that Gay's principal duty was not repair work, and, indeed, that pumping out barges, the activity in which he was engaged at the time of his injury, was no more so. No evidence was adduced that Barge 266 had any structural or mechanical defects or that she was in any way unseaworthy, with the sole exception that she had taken on water. There was no evidence that the other barges Gay had pumped out from time to time were in need of repair. There was testimony, however, from which the inference could be drawn that barges like the M266 often take on water, and that pumping the water out was simply one of the incidental chores involved in operating barges. Thus, the jury might reasonably have concluded that pumping water from a barge is routine and expected maintenance, and not "repair" work under § 905(b).[11]

The fact that the volume of water that Barge 266 had taken on made her unseaworthy does not waterlog that conclusion. First, the nature of the work did not change with the volume of water. Putting gasoline in one's car, for example, is not transformed from maintenance to repair simply because one has run the gas tank dry. While there are many situations to which this analogy is ill-suited, we find it appropriate here. Second, in order to find that barge-pumping made Gay a ship repairman, the evidence would have to show that he did repair work "regularly," even if infrequently. Thus, he would have to have "regularly" pumped water from barges that had taken on so much as to be made unseaworthy. No such evidence was adduced.

### III

The district court also granted the directed verdict on the alternative ground that Gay's injury was caused by the negligence of fellow longshoremen. Section 905(b) provides that a longshoreman may not maintain an action under that section "if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." The district court concluded that Gay's injury was caused by the negligence of Kemp, the foreman, and the work crew itself, who decided to use the board as a gangway. The court found both Kemp and the crew to be "engaged in providing stevedoring services" to Barge 266 at the time of the injury.

We agree with the district court that the record demonstrates beyond question that Kemp, Gay, and the rest of the work crew were negligent in using the board as a gangway. We also agree that their negligence was a proximate cause of Gay's inju-

---

7. 432 U.S. at 274, 97 S.Ct. at 2362.

8. *See id.* 432 U.S. at 262–66, 97 S.Ct. at 2356–57; *Ducrepont v. Baton Rouge Marine Enters., Inc.,* 666 F.Supp. 882, 884–86 (E.D.La.1987), *aff'd,* 877 F.2d 393 (5th Cir.1989).

9. *See New v. Associated Painting Servs., Inc.,* 863 F.2d 1205, 1210 (5th Cir.1989).

10. *E.g., Treadaway v. Societe Anonyme Louis–Dreyfus,* 894 F.2d 161, 164 (5th Cir.1990).

11. *See New,* 863 F.2d at 1210.

ry. If a reasonable jury could find naught but that the crew's negligence was the *sole* cause of the injury, then a directed verdict would have been appropriate. That, however, is not the case.

The Supreme Court's seminal decision in *Scindia Steam Navigation Co. v. De Los Santos*[12] constructed the framework defining the shipowner's duty of care under § 905(b). The Supreme Court held that, before turning the vessel over to the stevedore, a shipowner must exercise due care to ensure that the ship and its equipment are in such a condition that the experienced stevedore "will be able by the exercise of reasonable care to carry on its ... operations with reasonable safety to persons and property."[13] Only after a stevedoring operation is underway may the shipowner as a general matter "rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards."[14]

█ In addition, this circuit has recognized a pertinent exception to *Scindia*'s broad statement of immunity for injuries occurring after stevedoring operations have begun: The vessel owner has a duty to intervene in the stevedore's operations when he has actual knowledge both of a hazardous condition *and* that the stevedore, in the exercise of "obviously improvident" judgment, intends to continue work in spite of that condition.[15] This court has previously held this duty applicable even when the vessel owner conducts its own stevedoring operations.[16]

█ The record contains evidence to withstand a motion for directed verdict on the issues of (1) whether Brown & Root, in its capacity as shipowner, (a) breached its duty to turn the vessel over in such a condition that the work crew could safely load the pumps onto the barge, or (b)

breached its duty to intervene in the operation in the face of its actual knowledge of the crew's "obviously improvident" decision to use the board as a gangway, and (2) whether such breach was a proximate cause of Gay's accident.

As to Brown & Root's duty with respect to the vessel's condition, Gay presented testimony that Lowery, Brown & Root's operations manager, had actual knowledge that the barge had no gangway. Lowery had visited the barge with Reese approximately two weeks before Gay's accident. Reese testified that he and Lowery had crossed over to the barge using the same board or a board identical to the one used by Kemp and the work crew. There can be little doubt that Lowery's knowledge could be imputed to Brown & Root in its capacity as shipowner *pro hac vice*, as it was Lowery who contracted with Torch, Inc. for use of the barge. Thus, Brown & Root was chargeable with knowledge that there was no safe means of access to the barge, and accordingly had a duty to remedy that situation before turning the vessel over to the stevedore. A reasonable jury might conclude that Brown & Root's failure to do so was a proximate cause of Gay's injury.

The fact that Lowery might have depended on Reese, his assistant maintenance manager, to rectify the problem does not discharge Brown & Root of responsibility for its failure to take reasonable care. First, a reasonable jury might find that Reese himself acted as an agent of Brown & Root in its capacity as shipowner,[17] so that both his actions and his knowledge of the situation were imputable to Brown & Root. If so, Reese's failure only compounded Brown & Root's negligence. Second, a reasonable jury might find that Reese acted for Brown & Root in its capacity of stevedore-employer. If so, then

---

**12.** 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

**13.** *Id.* at 166–67, 101 S.Ct. at 1621–22.

**14.** *Id.* at 170, 101 S.Ct. at 1623.

**15.** *Randolph v. Laeisz,* 896 F.2d 964, 970 (5th Cir.1990); *Masinter v. Tenneco Oil Co.,* 867 F.2d 892, 897 (5th Cir.1989); *Helaire v. Mobil Oil Co.,* 709 F.2d 1031, 1038–39 (5th Cir.1983); *Turner v.*

*Costa Line Cargo Services, Inc.,* 744 F.2d 505, 512 (5th Cir.1984) (Gee, J., dissenting).

**16.** *Castorina v. Lykes Bros. S.S. Co.,* 758 F.2d 1025, 1032–33 (5th Cir.1985).

**17.** *Cf. Pichoff v. Bisso Towboat Co.,* 748 F.2d 300, 302–03 (5th Cir.1984).

Brown & Root as shipowner could not rely on Reese to fulfill its duty of care with respect to providing a proper gangway.[18]

Retrial of this case might easily have been avoided without compromising the district court's view of the law and the evidence. The case had, in effect, been almost fully tried. It would have taken only a few hours for the district court to hear defendants' case; the jury could then have decided the matter. If the jury rendered a verdict that, in the district court's opinion, was unsupported by the law and the evidence, it could have granted judgment notwithstanding the verdict. If its decision were reversed on appeal, we simply could have reinstated the verdict.

For the reasons stated above, we REVERSE the judgment of the district court and REMAND the cause for a new trial.

18. *Sarauw v. Oceanic Navigation Corp.,* 655 F.2d 526, 528 (3d Cir.1981), *cert. denied sub nom. American Commercial Lines, Inc. v. Griffith,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *see Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622.