751 So.2d 379 (2000)
Frank M. FEURTADO
v.
ZAPATA GULF MARINE CORPORATION, et al.
No. 99-CA-1510.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 2000.
Rehearing Denied February 15, 2000.
*380 Thomas A. Gennusa, II, Charles J. Ferrara, Law Offices of Thomas A. Gennusa, II, Metairie, Louisiana, Counsel for Plaintiff-Appellee.
Miles P. Clements, Monique G. Morial, Robin Wood Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, Louisiana, Counsel for Defendant-Appellee.
Lindsay A. Larson, III, Michael L. Vincenzo, New Orleans, Louisiana, Counsel for Defendant-Appellant.
Court composed of Judge WILLIAM H. BYRNES, III, Judge MOON LANDRIEU, Judge JAMES F. McKAY, III.
BYRNES, Judge.
Defendant-appellant, Universal Services and Associates, Inc. ("Universal"), appeals a judgment on the issue of liability only (the right to try the issue of damages being reserved to the plaintiff for a later date), finding that the plaintiff-appellee, Frank M. Feurtado, was injured through the sole negligence of Universal, and that Zapata Gulf Marine Corporation ("Zapata"), Jackson Marine Corporation ("Jackson"), and Tidewater, Inc. were free from fault. The judgment also held that Mr. Feurtado is not a seaman and thus not entitled to remedies under the Jones Act, 46 U.S.C.A.App. § 688. The judgment further held that Feurtado was a repairman within the meaning of Section 905(b) and, therefore, could not recover damages from defendants Zapata, Tidewater, Inc., and Jackson Marine under Section 905(b) of the Longshore and Harbor Workers' Compensation Act. Universal appealed assigning as error only the following findings of the trial court: (1) The finding that Universal was negligent and that said negligence was the proximate cause of Feurtado's injuries; (2) the failure to find that Feurtado was contributorily negligent; (3) the failure to find that Zapata was contributorily negligent in failing to warn Feurtado of the presence of the slippery substance on the floor of the fuel tank; (4) the finding that Feurtado was a repairman under 33 U.S.C.A. § 905(b). Feurtado did not assign as error the finding of the trial court that he was not a Jones Act seaman. No other party appealed or answered the appeal.
At the time he was injured on November 21, 1989, the plaintiff, Frank M. Feurtado, had been employed as a port captain by Zapata Gulf Marine Corporation ("Zapata") for several years. On the day he was injured, he descended into the M/V Raleigh Ann's ("the vessel") No. 4 port fuel tank to inspect the tank in response to a report of a water leak. While trying to pass from one section of the tank to another he allegedly slipped and fell on a slippery substance resulting in the injuries that led to the filing of this suit. Universal cleaned and de-gassed the tank a week earlier.
It was stipulated that the vessel was owned by the defendant, Jackson Marine Corporation, and Zapata was the owner pro hac vice. Tidewater was named simply *381 as the corporate successor to Zapata as of January of 1992.

I. Was Universal negligent and was that negligence the proximate cause of the accident?
Universal assigns as error the finding of the trial court that Universal's negligence was the sole cause of the accident. Universal argues that it was not responsible for the substance which caused plaintiff to slip, that Zapata was contributorily negligent in failing to warn Feurtado of the presence of the slippery substance and that Feurtado's own negligence in proceeding into the fuel tank after noticing that it was slippery was a contributed to the accident.
Universal asserts that it was hired by Zapata, not to make the fuel tank free of slippery substances, but to remove combustible contents so that "hot work" could be done in the tank without the risk of explosion. Universal notes that the independent professional inspection conducted immediately after Universal completed its work on November 14, 1998, shows that the tank was, in fact, free of "substantial residue" and that the air inside was noncombustible and breathable. Universal also contends that it was not responsible for slippery substances that may have accumulated on the floor in the week after it cleaned the tank on November 14, and the time that Feurtado allegedly slipped and fell a week later on November 21.
Universal states in its brief that it is undisputed that it "was hired by Zapata, through Feurtado, to pressure wash, clean[1] and "gas free" the no. 4 fuel tank..."
Universal's invoice for "11/13/89" states the following:

# 4 PORT AND STARBOARD FUEL OIL TANKS Ins. Claim # A0H050
1) As instructed, began pumping waste diesel fuel oil from # 4 port and starboard fuel oil tanks into vacuum truck for disposal.
2) Manually removed all sludge and debris from both tanks and prepared them for gas freeing.
3) Pressure washed and chemical cleaned both tanks for gas-freeing purposes.
4) Pumped wash water and fuel oil residue from both tanks into vacuum truck for disposal.
5) Acquired gas free certificate for both # 4 port and starboard fuel oil tanks to perform hot work.
6) Provided vacuum turck [sic] service for the disposal of wash water and diesel fuel oil.
7) Provided an E.P.A. approved site for the disposal of wash water and diesel fuel oil.
Mr. Rodney Abshire testified as the corporate representative of Zapata/Tidewater. At the time of Mr. Feurtado's accident he was the operations manager for Zapata, giving him authority over Mr. Feurtado. Mr. Abshire testified that Universal was contacted "to go up there and clean[2] the floors ..." Mr. Abshire was under the impression that once a gas-free certificate was issued it was good until the ship moved.
Mr. Feurtado testified that when he entered the # 4 tank he wore safety shoes which he described as "oil resistant" which we may assume means that they were intended to resist skids on oily surfaces. No one told him that they had smelled a strong odor of fuel oil in the tank. Mr. Abshire had told him that the tank had been cleaned. When asked what conditions he encountered when he started to make his way towards the back for inspection purposes he replied: "The bottom of the tank was extremely slippery." He also testified that this was not normal following the cleaning of a tank.
*382 He testified that you never really get rid of the odor of diesel, but he recalled no particular intensity of the odor on the day he slipped.
Mr. Carl Bandy, the Chief Engineer aboard the vessel, testified that on November 18 he noted a "very strong odor of diesel fuel and also a lot of rust in the corners and underneath high beamers with pockets of fuel under the rust." He testified that he saw more residue in the # 4 port tank than he had ever seen in a tank that had been gas freed. When Mr. Bandy observed the tank on November 18, there had been no work done in the tank since the time it had been cleaned by Universal on November 18. He did not note anything particularly slippery when he inspected the tank, but indicated that if you stepped on a rust covered pocket of fuel you could come into contact with slippery oil.
Mr. Frank Valls a Marine Chemist for O'Connor, Valls laboratory testified that his job was to test confined spaces for the presence of flammable, combustible or toxic materials or vapors. He testified that a gas free certificate is not intended to mean that the floor is not slippery. He said that reinspection is necessary every twenty-four hours if anyone intends to work in the tank, but Mr. Bandy gave uncontradicted testimony to the effect that no work had been done in the tank between the time it was cleaned by Universal on November 13-14, and the time Mr. Feurtado was injured on November 21.
Based on our review of the record as a whole we find that Universal's duty to render the tank "gas-free" is not necessarily identical to its duty to clean the tank. Regardless of what it may mean to render the tank gas-free, Universal's own invoice references cleaning services, its brief as quoted earlier lists cleaning among the services it rendered in this case, Mr. Abshire testified that Universal was contacted "to go up there and clean the floors...," and Mr. Bandy testified that he saw more residue in the tank than he had ever seen in a tank that had been gas-freed. We cannot say that the trial court was manifestly erroneous in choosing to credit this evidence as it implicitly must have, and in doing so, inferring that Universal had undertaken to clean the tank, an undertaking which was not properly discharged, resulting in the injuries to Mr. Feurtado that are the subject of this suit.

II. Was Mr. Feurtado contributorily negligent?
Mr. Abshire was not present the day Mr. Feurtado was injured and had no independent recollection of what occurred on that day. He did not recall whether it was he who instructed Mr. Feurtado to inspect the No. 4 tank for a leak on November 21. Mr. Feurtado testified that he was directed by Mr. Abshire, his supervisor, to inspect the tank.
Mr. Feurtado testified that the tank "had excessive slippery fill over the bottom of the tank" and that it had not been properly cleaned by Universal. He said that he was wrong to proceed after he knew that it was slippery.[3] He said that he thought it was dangerous but elected to proceed anyway. When asked what conditions he encountered when he started to make his way towards the back for inspection purposes he replied: "The bottom of the tank was extremely slippery." In fact, he had to brace himself against the walls to keep from slipping. Mr. Abshire testified that Mr. Feurtado could have asked Universal to return if he felt that the # 4 fuel tank had not been properly cleaned, and in fact it was his duty to do so. But it was implied that Mr. Feurtado had to go into the tank to determine if cleaning were necessary.
In the face of Mr. Feurtado's admission that he knew that the surface of the tank was excessively slippery, we *383 would normally be compelled to find that Mr. Feurtado was comparatively negligent. Prior to the effective date of Act 431 of 1979, Mr. Feurtado's actions may have constituted assumption of the risk which would have been a complete bar to recovery. Although the concept of assumption of the risk as a complete bar to recovery has been abandoned in favor of the civilian concepts of comparative fault and duty/ risk, such conduct still results in a reduction of recovery under the concept of comparative negligence. Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1133 (La.1988).
Mr. Feurtado's actions amount to what we would ordinarily find to be contributory negligence, and at this point we would assign the lowest percentage of comparative negligence on Mr. Feurtado's part that is reasonably within the discretion of the trial court in order to rectify the trial court's failure to allocate any of the negligence to Mr. Feurtado. Clement v. Frey, 95-1119, 95-1163, p. 8 (La.1/16/96); 666 So.2d 607, 611.
But Mr. Feurtado takes the position, in effect, that because it was part of his job to inspect the tank, he cannot he held to be contributorily negligent in proceeding in the face of a known risk. Where an employee takes actions pursuant to the discharge of his employment duties in the face of a known risk, which actions are reasonable in relation to those duties, then the employee is not comparatively negligent. Bergeron v. Blake Drilling & Workover, 599 So.2d 827, 843-844 (La.App. 1 Cir.1992); writ denied 605 So.2d 1117 & 1119 (La.1992). What actions are reasonable under the circumstances is a question of fact to be determined by the fact finder. Factors to be considered in determining what is reasonable include the availability and practicability of other options. Richard v. St. Paul Fire and Marine Ins., 94-2112, p. 6-7 (La.App. 1 Cir. 6/23/95); 657 So.2d 1087, 1091. We infer from the failure of the trial court to assign any comparative fault to Mr. Feurtado, that the trial judge found that Mr. Feurtado's decision to discharge his duty to inspect the tank by proceeding in the face of a known slippery condition was reasonable in view of the only other option suggested by Universal, i.e., that of postponing the search for the leak until another clean-up of the tank could be ordered and completed. We cannot say that the trial court was manifestly erroneous in implicitly deciding that the delay involved in pursuing such an alternative was a factor permitting a finding that Mr. Feurtado was reasonable in believing that the proper discharge of his employment duties required that he not postpone the inspection for what may have been an unreasonable period of time. Id. This is not the same as saying that this Court would not have weighed the evidence differently had it been sitting as the original finder of fact.

III. Was Zapata contributorily negligent in failing to warn Feurtado of the presence of the slippery substance?
Universal contends that at least some of the comparative fault should be assigned to Zapata because it had knowledge of the slippery condition and failed to warn Feurtado. There is some disagreement as to what Zapata knew, when it knew it, what may have been communicated to Mr. Feurtado, and by whom. However, it is not necessary that we resolve that dispute as we find that Zapata's negligence, if any, did not contribute to Mr. Feuratdo's injury. Mr. Feurtado was fully aware of the slippery nature of the tank based on his own independent observations. Had Zapata informed him of the presence of slippery substances in the tank, we do not see how such information would have added anything to the information Mr. Feurtado obtained through his own admitted observations on the scene.

IV. Was Mr. Feurtado a repairman under 33 U.S.C.A. § 905(b)?
Universal does not contest the fact that if Mr. Feurtado was a "repairman" at the *384 time of his injury, then he cannot recover from Zapata, Tidewater and Jackson. Universal disputes Mr. Feurtado's status as a repairman. 33 U.S.C.A. § 905(b) bars a tort action against the vessel or vessel owner pro hac vice where the vessel owner is also the employer of the injured party and the injured party "was employed to provide ... repairing ... services ..."
The fact that a worker may be engaged in repair-type work at the time of his injury, or that he performs such work form time to time does not bar recovery under the statute. Gay v. Barge, 915 F.2d 1007, 1011 (5 Cir.1990).
In New v. Associated Painting Services, Inc., 863 F.2d 1205, 1210 (5th Cir. 1989), the court explained that:
"... [R]epair" in 905(b) must be given its ordinary meaning, "to restore to a sound or healthy state." ... [I]f [the worker] is hired to restore a vessel to safe operating condition, he has been hired to perform "repairing ... services" under § 905(b). If, however, he is hired to preserve the vessel's current condition, he is performing routine maintenance not covered by [§ 905(b)].
Universal contends that it is undisputed that Mr. Feurtado spent at least 40% of his time in the office performing administrative duties, not to mention numerous other non-repair duties such as obtaining groceries and supplies for the vessel, purchasing spare parts, hiring contractors to work on vessels, inspecting work performed by contractors and performing maintenance. Implicit in Universal's argument is the contention that to be a repairman under § 905(b) means that repair work must be the primary purpose of the worker's job and that repair means to restore the vessel from inoperable condition. Universal contends that "[t]he question to be determined is not whether the injured party was performing repair work at the time of the injury or whether the worker performs repair work as part of his overall duties, but whether such work is the worker's principal duty," citing Gay v. Barge, 915 F.2d 1007 (5 Cir.1990). We find no such "principal duty" language in Gay. Instead, we find that Gay speaks in terms of "whether the employee `regularly performs some portion of what is indisputably [ship-repair] work,' or has been assigned for an appreciable period of time to do `substantial [ship-repair] work... even though the assignment is not `permanent"'". [Emphasis added.] Id. at p. 1010. Later the Gay court states that:
Second, in order to find that barge-pumping made Gay a ship repairman, the evidence would have to show that he did repair work "regularly," even if infrequently. [Emphasis added.]
Id., at p. 1011.
We find that Easley v. Southern Shipbuilding Corp., 936 F.2d 839, 843-845 (5 Cir.1991), gives the most helpful analysis of this issue:
According to his deposition and his time slips, Easley performed a number of duties in and around the Southern Shipbuilding yard. In just the month before his injury, he worked on locomotive cranes and yard equipment; performed on shore maintenance on a gantry, the dry dock, a work boat, and portable tools; worked in the compressor room; and performed other shore maintenance chores. His time slips and his position indicate that these were his normal activities over the two and one half years that he worked as a mechanic for Southern. In addition, at the time of his injury Easley had been assigned to substitute as a deckhand on the No. 6 for but a single day, a type of duty he performed intermittently, at most when one of the pertinent crew members was unavailable.
The plaintiff also argues that he is not a shipbuilder or a ship repairman because he did not personally build or repair ships. It is not necessary that a worker, however, actually build or repair ships to be included within these classifications. He must only be directly involved *385 in the shipbuilding or repair process. Alabama Dry Dock and Shipbuilding Co. v. Kininess, 554 F.2d 176 (5th Cir.), cert. denied 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977). In Kininess the plaintiff was injured while sandblasting rust from parts of an unassembled crane. Once assembled, the crane itself would be directly involved in the shipbuilding process. Because the injured worker's activity was a necessary prerequisite to the crane's use, the worker was found to be directly involved in the shipbuilding process. Id. at 178. See also Alford v. American Bridge Div., United States Steel Corp., 642 F.2d 807, 812-13 (5th Cir.), modified in part 655 F.2d 86 (1981), cert. denied 455 U.S. 927, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982); Ingalls Shipbuilding Corp.v. Morgan, 551 F.2d 61, 62 (5th Cir.), cert. denied 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (1977).
The district court was correct in concluding that Easley was a ship repairman as a matter of law. As a mechanic who repaired and maintained equipment used in the shipbuilding and repair process he supported those who actually built and repaired ships. Clearly, Easley's duties directly furthered the shipbuilding or ship repair process.[4] Therefore, he is a shipbuilder or repairer for purposes of the LHWCA. Easley further argues that (1) he cannot be a shipbuilder or ship repairman because many of his principal duties were so far removed from the process that he could not possibly be considered directly involved, and (2) at the time of his injury, he was engaged as a deckhand on the No. 6 and was therefore totally removed from the shipbuilding/repair process. Both of these arguments fail. It is well settled in this circuit that the measure of longshoreman status is character of the employee's work taken as a whole, not in piecemeal time increments or in distinct but temporary job assignments. [Footnote omitted.] We examine not just the work in which he was engaged at the moment of his injury, but the entirety of his duties. Gay v. Barge 266, 915 F.2d 1007, 1010 (5th Cir.1990).
* * * *
We find that because a substantial amount of his work contributed to the shipbuilding/repair process, Easley was a shipbuilder or ship repairman. [Emphasis added.]
In Warwick v. Huthnance Div., Grace Offshore Co., 760 F.Supp. 571 (W.D.La. 1991), the court held that a worker who had been hired as a roustabout or floor hand was nonetheless to be classified as a repairman where he had been engaged in repair activities for the two months prior to his injuries.
Mr. Abshire testified that he oversaw repairs, groceries or provisions for the vessel, fuel and getting the boat ready to sail, and crews. However, it was personnel, not he, who designated the crew. He testified that the difference between the port engineer and the port captain is that the port engineer "was mainly into repairs, the port captain was overriding the port engineers, in higher authority." In the absence of the operations manager the port engineer reports to the port captain. As port captain, Mr. Feurtado was assigned responsibility for approximately thirty tugs.
Mr. Abshire testified that:
A. .... Someone had to go look, I went on occasions, but Frank went and look [sic] to what repairs were, meet with the crew, get their repair list and we would go from there. [Emphasis added.]
Q. So he would be the person going out to do those things as opposed to you who oversaw through Frank [Feurtado] that they were in fact completed, is that fair in your opinion?

*386 A. Yes, that's fair.
Q. Now, what is the purpose in reference to the vessel for making sure the repairs were done ...? [Emphasis added.]
A. .... [The vessel] was in the wharf at Thalia Street for repair and she had just come off a job and we were getting it ready to go again. [Emphasis added.]
Mr. Abshire testified that from time to time he was physically involved in making repairs and would not dispute it if Mr. Feurtado said that he was, too.
Mr. Abshire testified that generally it would be Mr. Feurtado who would go aboard to make sure that repairs were done the way they were supposed to be, that Mr. Feurtado would be the hands on person to do so. Mr. Abshire stayed in the office most of the time, so he did not know if Mr. Feurtado actually did handson repairs. Mr. Abshire testified that Mr. Feurtado had to go on one of the thirty to thirty-two vessels under his charge almost every day and that after repairs were made he would have to be on the vessel for sea trials to make sure the repairs were made properly. Under Easley, supra, Mr. Feurtado's attendance at sea trails would be characterized as being in furtherance of the repair process.
Mr. Feurtado testified that he was called in to inspect the # 4 fuel tank because there was a report of water leaking in that particular tank. He stated that he moved to various locations depending on where he was needed:
If a vessel needed to be prepared for another transit or another tow. If the vessel had repairs to be done I would be dispatched there.
Mr. Feurtado explained his duties as follows:
My duties as a port captain was to maintain those vessels to see that they were always ready for jobs. To do whatever was required to make sure that they were ready whether it be calling out services to be done or physically doing the work myself where possible. And it was emphasized that wherever possible or practical and whenever it was possible that the work was to be done with the crew and assisting the crew.
Mr. Feurtado testified that he assisted in and engaged in helping to make repairs and that his involvement in repairs was one of his primary duties as a port captain. When asked what repair activities he was involved in, he testified that he would "change out steering ramps, ... swing generators, ... remove power packs, ... change out heads, water pumps ... remove and install tow cables." He testified that he was the person who usually put in new towing sockets and that he engaged in this activity on a very regular basis as opposed to an infrequent basis. Mr. Feurtado described a time when he had to put on diving gear to inspect a hole in a ship that needed repairing.
He testified that he did not go to his office on a daily basis when he had work to be done on a vessel. He testified that the majority of his time, over 60%, was spent related to vessels out of the office and he estimated that between sixty and seventy percent of his duties were repair related.
Mr. Feurtado testified that he and Mr. Abshire worked together about ten percent of the time, contradicting Mr. Abshire's estimate that they worked together approximately 25% of the time. The trial court would not be manifestly erroneous in choosing to credit Mr. Feurtado's testimony, especially in view of his obvious candor on other issues. Accordingly, Mr. Abshire would not have been present on most of the occasions when Mr. Feurtado was doing repair work. The fact finder could take that into account when deciding to credit Mr. Feurtado's testimony as to whether and he himself physically engaged in repairs as opposed to merely supervising them, and to what extent his other activities may have been involved in the repair process. Moreover, the language of *387 Easley appears to be broad enough to include one who supervises repairs as part of the repair process, and, therefore, a repairman.
Mr. Feurtado explained at trial that when he stated in his affidavit that it was his duty to "inspect, maintain and prepare the vessels," that he was referring to repairs. As port captain one of the first things Mr. Feurtado would do when vessels came to port was to get the repair list. He testified that repairs were a very large portion of his duties and that public relations was a very small part.
Based on our analysis of the fact and law as set forth above we find no error of law and no manifest error of fact in the trial court's finding that Mr. Ferutado should be classified as a repairman.

DECREE
For the foregoing reasons the judgment of the trial court is affirmed.
AFFIRMED.
LANDRIEU, J., dissents with reasons.
LANDRIEU, J., dissenting.
As a port captain, the plaintiff, Mr. Fuertado, worked in a supervisory capacity, having responsibility for approximately thirty tugs. He spent forty percent of his time in the office performing administrative duties. Although he was sometimes physically involved in making repairs, he was primarily responsible for making sure repairs were done, and at the time of his accident, was in fact inspecting a repair, i.e., the cleaning of the tank. By plaintiff's own admission, he was wrong to proceed knowing the tank was dangerously slippery. This admission implies that plaintiff had the choice not to proceed, that he could have, in fact, stopped and ordered Universal to re-clean the tank, as Mr. Abshire testified. In light of this evidence, plaintiff's actions cannot be considered a reasonable discharge of his employment duties under Bergeron v. Blake Drilling & Workover, supra, cited by the majority.
Accordingly, it was manifest error for the trial court to fail to assign any degree of comparative negligence to the plaintiff. I find that fifty percent (50%) is the least amount of fault that may be reasonably attributed to the plaintiff under the circumstances. Therefore, I would alter the judgment to hold Universal fifty percent (50%) liable and the plaintiff fifty percent (50%) liable. For this reason, I respectfully dissent.
NOTES
[1] Emphasis added.
[2] Emphasis added.
[3] Mr. Feurtado's candor is noteworthy. It is understandable that the trial court would choose to credit his testimony, as it implicitly did.
[4] Emphasis added.